767 A.2d 874

Lisa BARTON,

v.

Alan HIRSHBERG.

Nos. 2322, Sept. Term, 1999, 0301, Sept. Term, 2000.

Court of Special Appeals of Maryland.

March 1, 2001.

2

4

6

**8**

Barbara E. Sosnick (Gregory R. Nugent and the Lewis Law Firm, on the brief), Washington, DC, for appellant.

Alec M. Lewis, Rockville, for appellee.

Argued before SALMON, ADKINS and RAYMOND G. THIEME (Retired, Specially Assigned) JJ.

ADKINS, Judge.

Lisa Barton, appellant, is unhappy with the trial court's award of joint custody and child support. She attacks the child's father, Alan Hirshberg, as unfit, and claims that his principal assets should have been considered in determining an award of child support. She also contends that the trial court's denial of her request for a protective order against Hirshberg was error. Appellant presents four issues, which we have rephrased and reordered:

(1) Whether the trial court erred in calculating child support;

(2) Whether the trial court erred in denying her petition for a permanent order of protection;

(3) Whether the trial court erred in awarding the parties joint legal custody and shared physical custody, and denying her request that appellee's contact with the child be limited to supervised visitation; and

(4) Whether the trial court erred in denying her request for attorney's fees.

With the exception of the fourth issue, we rule in favor of appellee.

## FACTS AND LEGAL PROCEEDINGS

The parties resided together as an unmarried couple from January 1991 until June 1996. On December 29, 1993, the parties' son, Adam, was born.

The parties separated in 1996. On June 4, 1996, they entered into a Custody, Child Support and Housing Agreement ("Agreement"). The Agreement provided that the parties would have joint legal custody of Adam and that "the principal residence of the child shall be with [Barton]" and provided a detailed visitation schedule between Hirshberg and Adam. The Agreement further contemplated that Hirshberg was to pay Barton $1,000 per month in child support. Additionally, the Agreement provided that Adam

> will be exposed to both of [the parties'] religions, but that he shall be raised primarily in the Jewish faith and will become a Bar Mitzvah. [Barton] agrees to support and encourage this participation in the Jewish faith. Further, if possible and they can afford to do so, the parties agree that Adam will attend preschool/day care at the Jewish Community Center.

On April 9, 1999, Hirshberg, unhappy with the 1996 Agreement, filed a Complaint for Child Custody, Enforcement and Modification of Agreement in the circuit court, seeking primary physical and legal custody of Adam or, alternatively, "a parenting access schedule for Adam that is consistent with his best interest." Hirshberg contended, *inter alia,* that Barton breached the Agreement by: declaring "her intention not to raise Adam as a Jew;" unilaterally removing Adam from enrollment at the Jewish Community Center; failing to consult with Hirshberg on issues regarding Adam's health; and failing to abide by the visitation schedule set forth in the Agreement. Barton also sought to change the Agreement, filing a Counter Petition for Custody, Child Support, and Enforcement of Agreement, contending that Hirshberg had "refused to allow the child to be exposed to [Barton's] protestant religion," and failed to pay for expenses and support as contemplated by the Agreement. Moreover, Barton contend-

ed that the visitation schedule "provided in the Agreement is no longer in the minor child's best interests. . . ." Barton sought sole legal and physical custody of Adam, a modification of the visitation schedule, increased support, and attorney's fees.

A hearing was held on the parties' motions from October 19 through October 21, 1999. Both parties testified at the hearing. Barton testified that Adam has lived with her since birth and that she has been his primary caretaker. She stated that she encouraged his participation in many "Jewish" activities, and that she had participated in many of these activities with Adam even though she is not Jewish. Moreover, she contended that she did not remove Adam from the Jewish Community Center; but rather, Adam stopped going to the Center because Hirshberg unilaterally refused to pay Adam's babysitter for as many hours as needed. She denied being disruptive of Adam's participation in Jewish activities and making negative comments about Judaism.

Barton further testified regarding concerns she had about Hirshberg's relationship with and treatment of Adam. She testified that Adam has resisted going to visitation with his father in the past. In fact, upon a therapist's recommendation, the parties mutually agreed to stop Adam's overnight visitation with Hirshberg for two years after the Agreement was signed. During that time period, Adam would visit with Hirshberg on Thursday and Friday afternoons without overnights.[1] Additionally, Barton complained that Hirshberg failed to exercise his visitation "approximately a third of the time . . . . because of his extensive travel-mostly for pleasure."

Barton testified about concerns she had with Hirshberg's supervision of Adam. She testified that Hirshberg had previously left Adam alone in a car at an airport and in a condominium during a vacation. Moreover, she alleged that Adam was sexually assaulted during a trip to Wyoming in March 1998 when Hirshberg left Adam in the unsupervised care of an

---

1. Adam resumed overnight visitation with Hirshberg in October 1998.

eight-year-old. Moreover, she accused Hirshberg of using illegal drugs and claimed he kept a bag of marijuana in his freezer.

Finally, Barton testified regarding alleged violence committed by Hirshberg against Adam and her on October 13, 1999, five days before trial. On that day, Barton, Hirshberg, and Adam were leaving Adam's soccer practice and Hirshberg was taking Adam for his scheduled visitation. Barton testified that Hirshberg "appeared in a rage" and refused to allow Adam to say good-bye to her. She alleged that Hirshberg subsequently "threw Adam into [his] car" and then "grabbed the seat belt and leaned his weight on top of Adam, who was struggling at the time ... and was trying to get the belt across him," and that Adam "was having trouble breathing." She further alleged that Hirshberg intentionally struck her on the leg when backing out of the parking space and that she suffered a severe bruise on her leg.[2]

Hirshberg also testified at trial. He testified that he has a good relationship with Adam, but that Barton has acted to undermine that relationship. He claimed that Barton calls Adam "three times, four times a day" when Adam is visiting Hirshberg and that these phone calls upset Adam. Moreover, she did not allow Hirshberg to have visitation during Passover 1999 and Hirshberg's birthday, as stipulated in the Agreement. He admitted smoking marijuana "approximately three times" in the previous year and that he had marijuana in his freezer, but that he had never used marijuana around Adam. He further testified that he left Adam in the car at the Jackson Hole, Wyoming airport, for "a few minutes," but that he "had a person from United Airlines essentially watch him" and that he could see Adam "at all times or almost all the time." Finally, he denied "throwing" Adam into his car and having any knowledge of hitting Barton with his car on

---

2. Based on these allegations, Barton filed a Petition for Protection from Domestic Violence and Child Abuse, and was granted an Ex Parte Order of Protection on October 14, 1999. The hearing on the Permanent Order of Protection was consolidated with the Complaint for Child Custody and Modification.

October 13, 1999. He testified that he did not believe he struck Barton and that she did not act in a manner consistent with him hitting her. Finally, he claimed Barton unilaterally removed Adam from the Jewish Community Center.

Dr. J. Burke Mealy interviewed the parties and Adam as a court appointed Custody Evaluator. Dr. Mealy concluded that Adam suffered from "Parent Alienation Syndrome" and "in a positive way idealize[d] his mother—my mother is perfect. . . . And negatively idealize[d] his father—my father is all bad." He provided a thorough evaluation of the personality of each parent, focusing on both strengths and weaknesses. Regarding Hirshberg, Dr. Mealey reported:

> Psychological evaluation of Alan Hirshberg shows a man very open to experience for its own sake. He is a person who seeks out novelty and variety. He is very responsive to beauty in art and nature, is attracted to new ideas and alternative value systems, is generally tolerant of others, and is more likely than most to adopt unconventional attitudes. He is somewhat extroverted, tends to be warm and affectionate toward others, and usually enjoys large and noisy gatherings. He has a high need for variety in his life and is interested in intellectual challenges and in unusual ideas and perspectives. . . .

> He is reasonably considerate of others and is reasonably dependable. He tends to plan for the future and exercises leadership skills. . . . [He] tends to be a strong minded, free spirit who thrives on variety and change. His curiosity and intellectual interests are likely to cover a wide range. He is able to adapt to new situations. . . .

> > \*　　\*　　\*

> Alan Hirshberg needs predictability and structure, and often seeks this by trying to get his own way. At times he can be overly authoritarian and demanding, critical and uncompromising. However, when he does not feel threatened he can be relaxed, tolerant and able to function well in groups. He copes well with stress, is generally clear thinking, effective and resourceful. He may use these character-

istics to influence, or even manipulate, others. Although he generally takes others into account, particularly within the general, sociable exchanges which he enjoys, he can also be self-centered, bent on winning and relentless in trying to get his own way.

At times his self-centered behavior is likely to produce interpersonal conflict. Since he is generally well liked, warm and charming, problems he experiences will be more likely to occur within long-term and close relationships.

* * *

In the long run and in the big picture, Alan can be expected to "be there" for his son. He will be likely to introduce Adam to intellectual stimulation, novelty, variety, cultural experience, art, nature, travel, etc. He may be expected to "spoil" Adam to some degree, offset by occasions where he indulges himself and puts Adam to the side. However, most of the time he can be expected to have Adam's best interest in mind and to work creatively with Adam to develop a secure future.

Dr. Mealey made similarly mixed observations about Barton.

Lisa Barton is a person who makes great efforts to be congenial and to conform on the surface to the rules of those in authority. She is not an introspective person and stringently avoids self disclosure. Although she is the person most likely to downgrade herself, she probably fears that revealing herself will be used against her. Her concern with public appearances is predominant and a means of trying to hide from herself and others feelings of inadequacy and insecurity. She tends to compensate for marked self-doubt by positioning herself to be in alignment with authority to be the good/righteous person as compared to some negative other.

* * *

As a parent she can be expected to be conscientious and cautious. She will tend to create a relatively pleasant atmosphere and will establish a structure which is regular and

repititions [sic]. She can be expected to teach Adam good rules of conduct and assure his conformity to societal expectations. Within the routine of their lives she can be expected to be protective, while cautiously exposing Adam to situations which vary in novelty or intensity. She is resourceful and able to plan ahead and will help Adam plan for his own future.

She has some tendency to be dependent and out of touch with her emotional needs. The risk exists that she would place Adam too much in a leadership role and rely upon him too much for her own emotional gratification, without truly being aware that she is doing so.

In situations involving emotional intensity, such as those associated with romantic relationships, Lisa Barton is likely to be least stable. Under those conditions, she might evidence impulsivity and emotional liability. For instance, it is possible that she might wish to change residences or even leave town somewhat on the spur of the moment in response to a romantic, or other emotionally intense, circumstance.

Dr. Mealey concluded that "both parents are generally devoted to Adam and have much to provide him. Unfortunately, at the present time Adam feels caught in the middle and enormously anxious in regard to losing his mother." Dr. Mealy concluded that this anxiousness led to him alienating his father and that "[t]his process is partially supported by his mother." He recommended that the parties continue joint legal custody, with Barton receiving primary physical custody.

At the conclusion of the three-day trial, the trial court held that the Agreement was valid and enforceable. In so doing, the court reaffirmed the Agreement's provision regarding Adam's religious upbringing. Commenting on the usefulness of the report of a "neutral" person like Dr. Mealy, the court awarded the parties joint legal custody. It gave Barton primary physical custody, and ordered that a specific visitation schedule be implemented. Additionally, the court awarded Barton $793 a month in child support and denied her request

for attorney's fees. The court ruled that Barton had failed to show by clear and convincing evidence that Hirshberg had committed an act of domestic violence when he struck Barton with his car and denied her request for a Protective Order. The trial court found that the car did hit Barton, which resulted in a bruise, but declined to find that Hirshberg acted purposefully in doing so. With regard to the alleged abuse of Adam, the court found Hirshberg's conduct toward Adam to be firm, but not abusive. This appeal followed.

Additional facts will be added as necessary to the following discussion.

## DISCUSSION

### I.

### Amount Of Child Support

Barton contends that the trial court erred in awarding her $793 a month in child support. In making its child support award, the court held that neither party had become voluntarily impoverished and refused to impute any additional income to either party. The court further found that Hirshberg's monthly income was $9,246 and Barton's was $4,530 a month. As the parties' combined income exceeded the $10,000 monthly income guideline for computing support under Md. Code (1984, 1999 Repl.Vol.), § 12–204(e) of the Family Law Article ("FL"), the trial court computed child support in the following manner:

> The percentage of the income is 32.6 percent for Ms. Barton and 67.4 percent to Mr. Hirshberg.... [T]his child is going to spend about 42 percent of his time with his father and 58 percent of his time with his mother.

> So the basic child support for Ms. Barton is $600 a month, and Mr. Hirshberg is $1,241. When you adjust the percentage of time the child spends with [each parent], the net basic child support obligation is $469 a month. Work-related child care is $480.

So, . . . the actual amount that Mr. Hirshberg will pay as child support is $793 each month. In addition to that, each party will be required to pay their respective percentage share of any extraordinary medical expense not covered by insurance.

Barton contends that the trial court erred in using $9,246 as Hirshberg's monthly income. According to Barton, "it was error for the circuit court . . . to specifically decline to consider [Hirshberg's] significant assets, and thus, his true financial circumstances." Specifically, Barton contends that the trial court failed to consider total assets as opposed to income and should have imputed income to Hirshberg on the grounds of voluntary impoverishment. We are not persuaded by these contentions.

■ In 1989, the General Assembly enacted the child support guidelines contained in FL section 12–201, *et seq.*, in order to fulfill three goals: "(1) to 'remedy a shortfall in the level of awards' that do not reflect the actual costs of raising children, (2) to 'improve the consistency, and therefore, the equity of child support awards,' and (3) 'to improve the efficiency of court processes for adjudicating child support.' " *Voishan v. Palma,* 327 Md. 318, 322, 609 A.2d 319 (1992).

■ In setting the guidelines, the General Assembly chose to utilize the income shares model. In *Voishan,* the Court explained that

[t]he conceptual underpinning of this model is that a child should receive the same proportion of parental income, and thereby enjoy the same standard of living, he or she would have experienced had the child's parents remained together. Accordingly, the model establishes child support obligations based on estimates of the percentage of income that parents in an intact household typically spend on their children. Consistent with this model, the legislature constructed the schedule in § 12–204(e), which sets forth the basic child

support obligation for any given number of children based on combined parental income.

*Id.* at 322–23, 609 A.2d 319 (citations omitted).

In utilizing the income shares model, the trial court is required to determine the parties' "combined adjusted actual income." *See* FL § 12–201(e). This figure is the sum of each party's respective "adjusted actual incomes," which is defined in FL section 12–201(d) as a party's actual income minus

(1) preexisting reasonable child support obligations actually paid;

(2) except as provided in § 12–204(a)(2) of this subtitle, alimony or maintenance obligations actually paid; and

(3) the actual cost of providing health insurance coverage for a child for whom the parents are jointly and severally responsible.

■ After determining the parties' combined adjusted actual income, a trial court should utilize the model set forth in FL section 12–204(e) to determine support obligations. *See Voishan,* 327 Md. at 323, 609 A.2d 319. In the instant case, the combined adjusted actual income of the parties exceeds $10,000 per month, which is the highest income contemplated by FL section 12–204(e). In such a case, "[i]f the combined adjusted actual income exceeds the highest level specified in the schedule in subsection(e) . . . the court may use its discretion in setting the amount of child support." FL § 12–204(d).

In *Voishan,* the Court of Appeals addressed the parameters of the trial court's discretion in an above-guidelines case. In that case, the parties' combined income exceeded $10,000 per month and the trial court found that "the parties' earnings created a ratio of 83 to 17 for [the father and mother's] respective percentages of their . . . income." *Voishan,* 327 Md. at 325, 609 A.2d 319. To calculate the father's child support obligation, the trial court determined the reasonable expenses of the child and "then calculated 83% of that figure" to arrive at the appropriate amount of child support. *Id.*

The Court upheld the child support award. In so doing, the Court rejected the arguments that it should restrict the trial court's methods of above-guidelines child support calculations, and impose a fixed percentage of income for levels above the guidelines, or require extrapolation from the guideline tables. *Id.* at 326–28, 609 A.2d 319. The court reasoned that while extrapolation "may act as a 'guide,' " discretion by the trial court was necessary in high income cases. *Id.* at 329, 609 A.2d 319. The Court explained:

> [A]t very high income levels, the percentage of income expended on children may not necessarily continue to decline or even remain constant because of the multitude of different options for income expenditure available to the affluent. The legislative judgment was that at such high income levels judicial discretion is better suited than a fixed formula to implement the guidelines' underlying principle that a child's standard of living should be altered as little as possible by the dissolution of the family.

*Id.* at 328, 609 A.2d 319.

Citing *Voishan* and the policy behind the guidelines, we held that the trial court abused its discretion in awarding child support in an above-guidelines case in *Bagley v. Bagley,* 98 Md.App. 18, 632 A.2d 229 (1993), *cert. denied,* 334 Md. 18, 637 A.2d 1191 (1994). In *Bagley,* the father's income was just under $10,000 per month and the mother's $1,374 per month. The mother claimed $4,577 in monthly expenses for the children, based on the following expenses: rent, utilities, telephone, food, clothing, medical/dental, transportation, automobile insurance, other household expenses, recreation, incidentals, and periodic payments. The master found that $1,850 of these expenses were "inappropriate expenses to be attributed to the children" and deducted this amount when fashioning a child support recommendation. *Id.* at 23–24, 632 A.2d 229. The trial court denied the mother's exceptions to these findings and "adopt[ed] the Findings and Recommendations of the Master as its own." *Id.* at 28, 632 A.2d 229.

We held that the trial court abused its discretion when it adopted the master's denial of certain expenses. We explained that the trial court failed to take into account whether the expenses claimed were for items that would be enjoyed by the children had the parents not separated.

> [T]he chancellor must determine if a child of a married couple living together as a family based on [the father's] income and standard of living would have the benefits of attending summer camp, enjoying access to a recreational vehicle, receiving generous gifts, possessing adequate and modern furniture, vacationing with relatives, etc. The chancellor should be cognizant that a child's needs, like an adult's, increase proportionately with their opportunity to participate in educational, cultural, and recreational activities. Moreover, each opportunity builds upon itself creating new opportunities. The end result, theoretically, is a child whose opportunities to realize his/her potential have not been diminished by divorce although the parent may incur greater expenses.

*Id.* at 38–39, 632 A.2d 229.

Barton relies on *Bagley* in support of her position. She contends that the trial court imputed insufficient income to Hirshberg, and erred in not considering his total assets as opposed to his net income. In support of this position, Barton contends that the trial court erred in not considering a document entitled "Asset Split," which detailed all of Hirshberg's financial holdings. These holdings included investments in real estate, precious metals, retirement funds, common stock, taxable bonds and non-taxable bonds. Hirshberg's financial statement, however, does contain the amounts received as income from these assets, including rental income, bond income, dividends, and income from the sale of assets.

Barton's reliance upon *Bagley* is misplaced. Our discussion in *Bagley* dealt exclusively with income, not assets. The analysis in *Bagley* follows the express and unambiguous terms of section 12–204 of the Family Law Article, which directs that "[t]he basic child support obligation shall be divided between

the parents in proportion to their adjusted actual incomes."
FL § 12–204(a)(1). The definition of actual income in Family
Law section 12–201(c) contains numerous enumerated factors
that constitute income, none of which includes unrealized gains
or appreciation in asset value. *Compare* FL § 12 –201(c) with
FL § 11–106(b)(11)(i) (directing that, for the determination of
**alimony,** the court shall consider "all income **and assets,**
including property that does not produce income") (emphasis
added).

Our holding in this case should not be interpreted to
mean that the assets of a party will never come into play when
making a determination regarding child support. For exam-
ple, if a parent voluntarily decreases his or her income in
order to avoid support payments, a court may find that a
parent has become voluntarily impoverished, and impute in-
come based on assets readily adaptable to income production.
Alternatively, in instances where the income of a parent is not
adequate to provide support to a child sufficient to meet the
standard of living established during the marriage, and the
parent has assets that could be converted into income-produc-
ing assets, a court might look to the parent's assets to
determine above-the-guidelines support. We do not agree,
however, that the mere ownership of non-income-producing
assets alone constitutes a basis for reliance upon those assets
in determining child support. Moreover, the decision to de-
vote assets to capital growth, rather than income production,
should be within the discretion of a parent, as long as the
children are provided reasonable support, consistent with that
provided during the marriage or other relationship. It would
be an unwise proposition, indeed, for a court to direct that a
parent expend or convert his or her investments to provide
support for children at a level above the guidelines, when the
parent had consistently, during the marriage or other relation-
ship, sought to utilize those assets for capital growth or other
legitimate purposes which were not income-producing.

In this case the trial court held that Hirshberg was not
voluntarily impoverished, and we agree. Although Hirshberg

previously earned a higher income, the uncontroverted evidence is that he was involuntarily terminated from his previous employment. At the level of income maintained by Hirshberg, the involuntary termination from employment justifies expenditure of less income for the family as a whole, even when assets could be sold to produce more money for child support. The parties' income is still well above guidelines, and there is no indication in the record that Adam is experiencing a decrease in his standard of living because of the parties' separation.

## II.

### Protective Order

■ Barton further contends that the trial court erred in denying her petition for a Permanent Order of Protection. She contends that the trial court applied an incorrect standard in determining whether domestic abuse occurred, and that the court was "influenced by improper considerations."

FL section 4–506(c)(1)(ii) provides that "if the court finds by clear and convincing evidence that the alleged abuse has occurred, ... the court may grant a protective order to protect any person eligible for relief from abuse." In pertinent part, "abuse" is defined as "(i) an act that causes serious bodily harm; (ii) an act that places a person eligible for relief in fear of imminent serious bodily harm; (iii) assault in any degree...." FL § 4–501(b).

■ The petitioner bears the burden of showing by clear and convincing evidence that the alleged abuse occurred. *See Ricker v. Ricker,* 114 Md.App. 583, 586, 691 A.2d 283 (1997); FL § 4–506(c)(1)(ii). "When conflicting evidence is presented, we accept the facts as found by the hearing court unless it is shown that its findings are clearly erroneous." *Piper v. Layman,* 125 Md.App. 745, 754, 726 A.2d 887 (1999). We leave the determination of credibility to the trial court, who has "the opportunity to gauge and observe the witnesses' behavior and testimony during the trial." *Ricker,* 114 Md. App. at 592, 691 A.2d 283.

In the instant case, the trial court heard conflicting versions of the events relating to the alleged abuse. After hearing the evidence, the trial court held that it was convinced that Hirshberg did hit Barton with his car, "[b]ut the evidence is not clear and is not convincing that it was done on purpose, intentionally, by Mr. Hirshberg." Moreover, the trial court rejected Barton's claim that Hirshberg threw Adam into the car. These conclusions were supported by sufficient evidence and are not clearly erroneous.

Barton contends that the trial court erred because it relied on Hirshberg's intent in holding that there was not clear and convincing evidence of abuse. She argues that Hirshberg acted recklessly in striking her and that, "[r]egardless of appellee's 'intentions,' the record is clear that the striking of appellant by appellee's automobile was an act causing serious bodily harm[.]" We reject these contentions.

While in some cases reckless behavior may form the basis for a complaint of domestic violence, the overall goals of the domestic violence statute would not be served by entering a protective order under these circumstances. "The purpose of the domestic abuse statute is to protect and 'aid victims of domestic abuse by providing an immediate and effective' remedy." *Coburn v. Coburn*, 342 Md. 244, 252, 674 A.2d 951 (1996) (quoting *Barbee v. Barbee*, 311 Md. 620, 623, 537 A.2d 224 (1988)). "The primary goals of the statute are preventive, protective and remedial, not punitive. The legislature did not design the statute as punishment for past conduct; it was instead intended to prevent further harm to the victim." *Coburn*, 342 Md. at 244, 674 A.2d 951.

There is no indication in the record that Hirshberg had acted recklessly in the past in a manner that would create danger to Barton or Adam. Further, there is no indication that Hirshberg ever committed any intentional acts of abuse against Barton or Adam that would require an protective order for protection. Under these circumstances, there is no need to protect Barton or Adam from Hirshberg. Indeed, any protective order would act as punishment to Hirshberg for

accidentally striking Barton with his car. As recognized by the Court in *Coburn,* punishment is not the purpose of the domestic violence statute. We hold, therefore, that the trial court did not err in denying Barton's petition for a permanent protective order.

██ Finally, Barton contends that the trial court was motivated by improper considerations. She originally obtained a temporary order of protection through an *ex parte* proceeding under FL section 4–505.[3] In making its ruling, the trial court stated:

> [T]here is some suggestion made by [Mr. Hirshberg] that [this] effort by Ms. Barton at the last minute [was done] to get an advantage for trial. I make no comment on that.

> But I do make a comment about this. That Ms. Barton certainly knew that this case that we are trying here in the courtroom today was set for trial today.

> * * *

> But she knew that this case was set for trial, and it would seem to me—I am a firm believer in this that I cannot think of any circumstance in life, in anybody's life, under any circumstances when it is inappropriate to be courteous, just courteous.

> If an event occurred that she felt strongly enough about to come into court and complain about when it happened it would have been courteous at the very least to put the other side on notice so that Mr. Hirshberg could have had a chance to tell his side of it at the same time, and it wasn't done.

Barton indicates that the above recital indicates a bias by the trial court and indicates that the court was "influenced by improper considerations." We disagree. The trial court was

---

3. FL section 4–505(a) provides, in pertinent part:

> (1) If a petition is filed under this subtitle and the court finds that there are reasonable grounds to believe that a person eligible for relief has been abused, the court, in an *ex parte* proceeding, may enter a temporary order to protect any person eligible for relief from abuse.

simply stating its opinion that, given the relationship between the parties, it would have been more courteous not to proceed *ex parte* on Barton's domestic violence claim. The trial court's ruling clearly indicates that the court relied on its evaluation of the evidence presented in making its decision. There is no indication that the trial court harbored any ill-will or bias against Barton. We, therefore, reject Barton's contention that the trial court acted inappropriately in denying her petition.

## III.

### Joint Custody

Barton next contends that the trial court erred in awarding joint custody, rather than sole custody to her and supervised visitation to Hirshberg. Barton's contention is two-fold. First, she contends that the trial court failed to consider the factors enumerated in *Taylor v. Taylor*, 306 Md. 290, 508 A.2d 964 (1986), and that there was "glaring lack of capacity of the parties herein to communicate and to reach shared decisions regarding the child's welfare." Second, Barton argues that "[t]he lack of fitness of appellee, both physical, as well as psychological, is perhaps the most compelling factor which warrants a reversal of the circuit court's shared custody decision."

Appellate review of a trial court's custody determination is limited. The standard of review in custody cases is whether the trial court abused its discretion in making its custody determination. *See Robinson v. Robinson*, 328 Md. 507, 513, 615 A.2d 1190 (1992). In *Davis v. Davis*, 280 Md. 119, 372 A.2d 231, *cert. denied*, 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), the Court explained that "when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." *Id.* at 126, 372 A.2d 231. Again, "[p]articularly important in custody cases is the trial court's opportunity to

observe the demeanor and the credibility of the parties and witnesses." *Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016 (1994).

The overwhelming concern in granting child custody is the best interest of the child. *See Monroe v. Monroe,* 329 Md. 758, 769, 621 A.2d 898 (1993). In *Hild v. Hild,* 221 Md. 349, 157 A.2d 442 (1960), the Court explained:

> For the purpose of ascertaining what is likely to be in the best interests and welfare of a child a court may properly consider, among other things, the fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex, and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child. It stands to reason that the fitness of a person to have custody is of vital importance.

*Id.* at 357, 157 A.2d 442.

In *Taylor, supra,* the Court first recognized that a trial court has the power to grant joint custody. In so doing, the Court listed a number of factors to consider in granting joint custody. "[C]learly the most important factor" is the capacity of the parents to communicate and to reach shared decisions affecting the child's welfare. *See Taylor,* 306 Md. at 304, 508 A.2d 964. Indeed, joint custody should not be awarded "in the absence of a record of mature conduct on the part of the parents evidencing an ability to effectively communicate with each other concerning the best interest of the child, and then only when it is possible to make a finding of a strong potential for such conduct in the future." *Id.* Nevertheless,

> [t]he parents need not agree on every aspect of parenting, but their views should not be so widely divergent or so inflexibly maintained as to forecast the probability of continuing disagreement on important matters.

\* \* \*

Ordinarily, the best evidence of compatibility with this criterion will be the past conduct or 'track record' of the parties. We recognize, however, that the tensions of separation and litigation will sometimes produce bitterness and lack of ability to cooperate or agree. The trial judge will have to evaluate whether this is a temporary condition, very likely to abate upon resolution of the issues, or whether it is more permanent in nature.

*Id.* at 305–07, 508 A.2d 964.

### 1. Cooperation Between The Parties

■ In this case, the record contained evidence of the parties' ability to cooperate in matters relating to Adam. First, there was the existence of the Agreement itself. The Agreement indicates the parties' willingness to work together to do what is in Adam's best interest. Moreover, when Adam was having trouble adjusting to the overnight visits with Hirshberg, both parties agreed to suspend the overnight visitation for nearly two years and agreed on a schedule of afternoon visitation. Additionally, the parties' willingness to work together was evidenced by an email sent from Barton to Hirshberg dated January 22, 1999. The email states:

Subject: The Greatest Kid ... Adam

Anyway, I was just thinking about Adam, schedules and such. How about if you wait on the temple stuff until he finishes with Dr. Miller in a couple of months. He's just 5, and there's no rush. Consider his weekends. He doesn't get to 'sleep in' on Saturdays because of Dr. Miller, and we all have to get up and going early for that. He deserves at least one day of the weekend to take his time getting up and ready. We need that too. We deserve two days of late risings, but for now have to deal with just one. I think it's too much to expect of him and us until Dr. Miller is finished which will be relatively soon. Ice skating is fine with a later pick-up. OK? ? ?

And meantime, remember that I do appreciate all that you've done for us and all the changes you've had to tolerate. We have a great little boy and are very lucky.

This evidence indicates that the parties have been able to communicate and reach decisions regarding Adam in the past. Admittedly, tensions and disagreements between the parties have escalated. Nevertheless, after hearing the testimony, and judging the credibility and demeanor of the witnesses, the trial court concluded that the parties could resolve their differences and act together in Adam's best interest. As the trial court correctly stated, "[b]y agreeing with each other 3 years ago that you were going to have joint legal custody of this child, you agreed with each other that you were equals. . . . You were both equal parents to this little boy. That is constant through this." The evidence supports the trial court's conclusion that the parties have been able to act jointly in Adam's best interest in the past.

### 2. Attack On Hirshberg's Fitness As A Parent

Barton next attacks Hirshberg's fitness as a parent. Specifically, she asserts that Hirshberg should only receive supervised visitation with Adam, and not share custody because: (1) he has left Adam unsupervised on a number of occasions; (2) he has a heavy travel schedule; (3) he has used marijuana; and (4) Adam's bond with Barton is much stronger than his bond with Hirshberg.

The trial court heard testimony and had the opportunity to weigh Hirshberg's alleged deficiencies as a parent in determining the best interest of the child. It received and considered the psychological evaluation performed by Dr. Mealy. In addition to acknowledging Hirshberg's weaknesses, this evaluation delineated certain of his qualities which enable him to offer a positive parental influence upon Adam. For example, Adam can benefit from exposure to Hirshberg's interest in intellectual challenge, his interest in beauty found in art and in nature, his search for new ideas and alternative value systems, and his tolerance of other's ideas. His forcefulness and leadership skills can prove instructive to Adam, as well as be beneficial in making decisions for Adam's education and childhood pursuits. If the parties work together for the best interest of their son, Hirshberg's strengths could balance well

with Barton's tendencies to be more of a conformist, and to adhere to the rules of those in authority.

Significantly, Hirshberg had previously agreed to take and has completed a parenting skills class. In doing so, he has demonstrated his commitment to acting in Adam's best interest. Certainly, some of Hirshberg's actions raise concerns. Leaving a young child alone, as he has done on occasion, may cause apprehension in a parent. Nevertheless, the evidence indicates that Hirshberg left Adam alone only for a short period of time. Additionally, Hirshberg testified that he has learned his actions concerned Barton and will be more attentive in the future. In light of all of the circumstances, we cannot say that these actions rise to the level of rendering Hirshberg an unfit parent.

■ Hirshberg's use of marijuana is also troubling, and we cannot condone it. Such unlawful action does not, however, operate to automatically disqualify him as a fit parent. First and foremost, Hirshberg's marijuana use has never occurred in the presence of Adam. His use has also been infrequent, and there is no evidence that Hirshberg has been under the influence of marijuana while caring for Adam. Nor is there any evidence that Adam is aware of his father's use of marijuana. The trial court must focus on the best interests of Adam, and evaluate Hirshberg as a parent for Adam. Hirshberg's marijuana use is just one factor for the court to consider. We will not hold that the trial court's finding that Hirshberg is "a proper custodian" for Adam was clearly erroneous based solely on his limited use of marijuana.

■ Barton next complains about Hirshberg's frequent travel schedule. After Barton presented evidence of his heavy travel schedule, Hirshberg acknowledged that he does travel frequently for both business and pleasure, but that he was willing to curtail his traveling in order to spend more time with Adam. No evidence was presented that would support the conclusion that Hirshberg's travel acted to Adam's detriment or that it should prevent Hirshberg from exercising his rights as a parent.

■ Barton also contends that Hirshberg's physical and mental problems should act as a bar to joint custody. Hirshberg, while fifty-seven years of age, continues to enjoy an active lifestyle and there is no indication that he does not have the physical ability to raise and interact with Adam. Regarding Hirshberg's mental fitness, Dr. Marc Hafkin, a psychologist who has treated him since 1984, testified that he had no reason to believe that Hirshberg would be violent to either Barton or Adam. Dr. Hafkin further testified that he never diagnosed Hirshberg with a narcissistic personality disorder as claimed by Barton. Based on this evidence, the trial court did not err in ruling that Hirshberg was physically and mentally fit as a parent.

### 3. Dr. Mealy's Report

■ Finally, Barton contends that the trial court erred in failing to consider Adam's close attachment to her in awarding joint custody. In so doing, she calls into question the report made by Dr. Mealy and the trial court's reliance on the report in awarding joint custody. Barton contends that Dr. Mealy's report "was incomplete, one-sided, and obsolete and did not provide an appropriate basis for the circuit court to delegate its decision making power in the determination of custody." Specifically, Barton challenges Dr. Mealy's failure to: (1) speak with her "collateral sources" even though he spoke with Hirshberg's daughter, fiancee, and stepson; (2) take into account Hirshberg's drug use; and (3) modify his conclusions based on the alleged domestic violence that occurred on October 13, 1999. Additionally, Barton attacks Dr. Mealy's report because "Dr. Mealy focused almost entirely on the so-called parental alienation syndrome, and the supposed effect of appellant's attachment to the child, in alienating the child from his father."

We reject Barton's contention that Dr. Mealy's report did not contain an adequate basis to support its conclusion. Dr. Mealy testified extensively regarding his methodology and provided sufficient justification for his conclusions. Barton contends that Dr. Mealy's report was one-sided because he

interviewed Hirshberg's daughter, stepson, and fiancee, but did not interview anyone suggested by Barton or Adam's teachers. Dr. Mealy, however, testified extensively about, and adequately explained his choice of interview subjects. He testified that he interviewed Hirshberg's adult daughter and stepson in order to get information regarding their respective relationships as a child with Hirshberg. Indeed, both Barton and Hirshberg had suggested that he talk to Hirshberg's daughter, and Barton indicated that the daughter would support her own negative assessment of Hirshberg.

Although Dr. Mealy fully expected Hirshberg's fiancee's testimony to be "quite slanted," he interviewed her because she lived with Hirshberg and he "need[ed] to make some independent evaluation of the stability of the co-parent in that household." In contrast, he chose not to interview Barton's parents because "of the time constraints on this case" and his "general experiences [that] the information that I will get from a parent tends to be pretty slanted[.]" Additionally, Dr. Mealy testified that he did not interview anyone at Adam's school because "[b]oth parents reported to [him] that [Adam's] school performance and adjustment was fine." In our view, none of Dr. Mealy's decisions regarding his investigation suggest a bias in favor or against either party. As is evidenced by the excerpts of his report that we earlier set forth, Dr. Mealy summarized the good and bad qualities of both parents.

Barton further contends that Dr. Mealy's report was inadequate because it failed to take into account Hirshberg's drug use and the alleged domestic violence that occurred on October 13. Dr. Mealy admitted that he did not "do a pointed investigation on drug and alcohol use," but that while drug use "raises serious questions ... in and of itself [it] is not much information at all, so it would not necessarily change anything." Again, there is no indication in the record that Hirshberg's use of marijuana in the past has been detrimental to Adam. Moreover, as discussed *supra*, the trial court was aware of the alleged domestic violence and found that Hirsh-

berg did not commit such an act. This conclusion was supported by the evidence.

Finally, Barton contends that Dr. Mealy's diagnosis of Parental Alienation Syndrome is inconsistent with an award of joint custody, and with his conclusion "that appellant should have significantly more visitation and spend much more time with the child because of the child's attachment to appellant." We disagree. In making his visitation recommendation, Dr. Mealy determined that Barton should have primary physical custody because Adam "takes his primary security there with his mother." He also found, however, that "the Parent Alienation process is considerably dangerous to Adam" and may result in him being "unnecessarily distanced from his father . . . and [he] may remain overly enmeshed with his mother in ways which impede his emotional maturation." Dr. Mealy's recommendation that Barton have primary physical custody with specified visitation with Hirshberg allows Adam to continue his close bond with his mother, while also developing a relationship with his father.

In sum, we hold that Dr. Mealy's report provided an adequate basis to support the trial court's decision. As the trial court correctly noted, "Dr. Mealy's interest is to be neutral and to use his experience and training and try to give information to [the court] that we can rely on[.]" The trial court used Dr. Mealy's report, as well as its own evaluation of the evidence and "considered all of the factors . . . required to [be] consider[ed] regarding the joint custody of children." For this reason, and because the trial court's decision regarding joint custody was supported by substantial evidence, we will not disturb it on appeal.

## IV.

### Attorney's Fees

Barton's final contention is that the trial court erred in failing to award her attorney's fees. Specifically, she argues that "the circuit court abused its discretion in denying [her] request for counsel fees and cost, solely because of its view

that the fees were excessive, and without consideration of the statutory factors...."

Under FL section 12–103, a court may award a party "the cost and counsel fees that are just and proper under all the circumstances...." In so doing, the court must consider:

(1) the financial status of each party;

(2) the needs of each party;

(3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.

FL § 12–103(b). "The award of fees and costs is within the sound discretion of the trial court, and such an award should not be modified unless it is arbitrary or clearly wrong." *Rosenberg v. Rosenberg,* 64 Md.App. 487, 538, 497 A.2d 485, *cert. denied,* 305 Md. 107, 501 A.2d 845 (1985). "When the case permits attorney's fees to be awarded, they must be reasonable, taking into account such factors as labor, skill, time, and benefit afforded to the client, as well as the financial resources and needs of each party." *Petrini,* 336 Md. at 467, 648 A.2d 1016.

In support of her request for attorney's fees, Barton presented invoices from her current and former counsel totaling over $62,000. In denying her request for attorney's fees, the trial court commented:

> I find the attorneys' fees claimed extraordinarily high and out of perspective with the issues and the difficulty and the extent of the litigation actually conducted.
>
> A review of the record supports that.... So, I am not awarding any attorneys' fees. I am denying the request for attorneys' fees.

The trial court's conclusion that the requested fees were extraordinarily high is supported by the evidence and not clearly erroneous. Indeed, as the trial court correctly noted, Barton's lawyers had been on the case for five weeks, and had spent a total of 319 hours working on the case. Barton was

also charged for two lawyers at trial at a total of $435 per hour.

 Nevertheless, a total denial of fees should not be based solely on the amount of fees requested. Our review of the record indicates that the unreasonably high amount requested was the sole basis for decision. In taking such a limited view, the court failed to consider the additional factors mandated by FL section 12–103(b). "Consideration of the statutory criteria is mandatory in making [an attorneys' fee] award and failure to do so constitutes legal error." *Petrini*, 336 Md. at 468, 648 A.2d 1016. Therefore, even if Barton is not entitled to all her requested attorneys' fees, she may be entitled to a lesser award. The trial court must apply all the statutory factors, not just the reasonableness of the fees requested, in determining whether or not to award attorney's fees. We, therefore, remand this case for the limited purpose of applying the factors mandated by FL section 12–103(b).

**JUDGMENT AFFIRMED IN PART, REVERSED IN PART. CASE REMANDED ON ISSUES OF ATTORNEY'S FEES. COSTS TO BE PAID 3/4 BY APPELLANT AND 1/4 BY APPELLEE.**