807 A.2d 1211

**Carol Marie McCARTY,**

v.

**Douglas Neal McCARTY.**

**No. 0171, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Sept. 26, 2002.

Mimi Magyar (Robert C. Kostecka and Caplan, Buckner & Kostecka, Chtd. on the brief), Bethesda, for appellant.

Deborah E. Reiser (Lerch, Early & Brewer, Chtd. on the brief), Bethesda, for appellee.

SONNER, ADKINS, CHARLES E., MOYLAN JR. (retired, specially assigned), JJ.

MOYLAN, Judge.

This case concerns the award of joint legal custody to the estranged parents of three-year-old Jessica McCarty. The appellant, Carol Marie McCarty (the Mother), and the appellee, Douglas Neal McCarty (the Father), were married on January 31, 1998. Jessica was born on August 8, 1999. The parties separated on November 17, 2000.

The Father filed a motion in the Circuit Court for Montgomery County, asking for both joint legal custody and joint

physical custody of his daughter. The Mother filed a counter-complaint in the same court, asking for a limited divorce and for sole custody, both legal and physical, of her daughter. After three rounds of hearings stretching from July 2, 2001, through February 25, 2002, Judge Ann N. Sundt, on March 4, 2002, awarded sole physical custody to the Mother but joint legal custody to the Mother and Father. The Mother has taken this appeal from that award of joint legal custody.

### Joint Legal Custody Versus Joint Physical Custody

Initially, it will be helpful to contrast joint legal custody and joint physical custody. Although the landmark case of *Taylor v. Taylor,* 306 Md. 290, 508 A.2d 964 (1986), discusses both forms of joint custody, it is careful to distinguish the two from each other. Writing for the Court of Appeals, Judge McAuliffe, 306 Md. at 296, 508 A.2d 964, first described joint legal custody.

[A] distinction must be made between sharing parental responsibility in major decision-making matters and sharing responsibility for providing a home for the child.

Embraced within the meaning of "custody" are the concepts of "legal" and "physical" custody. *Legal custody carries with it the right and obligation to make long range decisions involving education, religious training, discipline, medical care, and other matters of major significance concerning the child's life and welfare.* Joint legal custody means that both parents have an equal voice in making those decisions, and neither parent's rights are superior to the other.

(Emphasis supplied).

Contrasted with joint legal custody is the very different phenomenon of joint physical custody.

*Physical custody, on the other hand, means the right and obligation to provide a home for the child and to make the day-to-day decisions required during the time the child is actually with the parent having such custody.* Joint physical custody is in reality "shared" or "divided" custody.

Shared physical custody may, but need not, be on a 50/50 basis, and in fact most commonly will involve custody by one parent during the school year and by the other during summer vacation months, or division between weekdays and weekends, or between days and nights.

306 Md. at 296–97, 508 A.2d 964 (emphasis supplied).

■ *Taylor v. Taylor* cautions, 306 Md. at 297, 508 A.2d 964, that it is vitally important to keep the two phenomena distinct.

*Proper practice* in any case involving joint custody *dictates that the parties and the trial judge separately consider the issues involved in both joint legal custody and joint physical custody,* and that the trial judge state specifically the decision made as to each.

(Emphasis supplied).

The only issue before us in this case is joint legal custody, and not joint physical custody. A cautionary note is in order in that many of the "joint custody considerations" discussed and analyzed in *Taylor v. Taylor* are more pertinent to the issue of joint physical custody than they are to the 'distinct issue of joint legal custody.

## A Deferential Standard of Appellate Review

As we approach our review of Judge Sundt's award of joint legal custody, we observe that the standard of appellate review is both limited and deferential. As Judge Adkins explained for this Court in *Barton v. Hirshberg,* 137 Md.App. 1, 24–25, 767 A.2d 874 (2001):

Appellate review of a trial court's custody determination is limited. *The standard of review in custody cases is whether the trial court abused its discretion in making its custody determination. See Robinson v. Robinson,* 328 Md. 507, 513, 615 A.2d 1190 (1992). In *Davis v. Davis,* 280 Md. 119, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), the Court explained that "when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon

factual findings that are not clearly erroneous, *the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." Id.* at 126, 372 A.2d 231. Again, *"[p]articularly important in custody cases is the trial court's opportunity to observe the demeanor and the credibility of the parties and witnesses." Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016 (1994).

(Emphasis supplied). See also *Leary v. Leary,* 97 Md.App. 26, 35–39, 627 A.2d 30 (1993).

Significantly, in none of the three decisions we have found dealing with joint custody was the discretionary decision of the chancellor overruled as a clear abuse of discretion. In *Taylor v. Taylor* the precise decision made by the chancellor was unclear and the case was, therefore, remanded simply for a clarification. In both *Barton v. Hirshberg* and *Leary v. Leary,* the decisions of the chancellors were affirmed as not having been clear abuses of discretion. Although appellate opinions frequently give a lot of advice, they rarely, if ever, actually find a reversible abuse of discretion on this issue.

In dealing with the standard of appellate review for assessing discretionary rulings as to child custody generally, the Court of Appeals, speaking through Judge Digges, could not have been more emphatic in *Davis v. Davis,* 280 Md. 119, 131–32, 372 A.2d 231 (1977):

A case such as this, where custody might well have been awarded to either parent, aptly demonstrates the advisability of leaving to the chancellor the delicate weighing process necessary in child custody cases; *to disturb the award here would require that we substitute our judgment for that of the chancellor,* and an appellate court sits in a much less advantageous position to assure that the child's welfare is best promoted.

(Emphasis supplied).

In affirming another custody decision in *Ross v. Hoffman,* 280 Md. 172, 186, 372 A.2d 582 (1977), Judge Orth was equally emphatic about the highly deferential nature of appellate review of such discretionary decisions.

*It is not enough that the appellate court find that the chancellor was merely mistaken in order to set aside the custody award. Rather, the appellate court must determine that the judicial discretion of the chancellor exercised was clearly abused.* This is the principle which controls the review of any matter within the sound discretion of a trial court.

(Emphasis supplied). See also *Petrini v. Petrini,* 336 Md. 453, 470, 648 A.2d 1016 (1994); *Robinson v. Robinson,* 328 Md. 507, 513–14, 615 A.2d 1190 (1992).

### The Significance of Apparent Unwillingness To Participate in a Shared Custody Arrangement

The Mother points to two factors to support her claim that Judge Sundt was guilty of a clear abuse of discretion in awarding joint legal custody. One is her own reluctance to share legal custody. One of the joint custody considerations discussed by *Taylor v. Taylor,* 306 Md. at 307–08, 508 A.2d 964, is the "willingness of parents to share custody." This is a factor that self-evidently applies to joint legal custody and joint physical custody alike. As *Taylor v. Taylor* discusses, 306 Md. at 307, 508 A.2d 964:

Generally, the parents should be willing to undertake joint custody or it should not be ordered.

In *Taylor v. Taylor,* however, the Court of Appeals rejected the proposition "that a trial judge may never order joint legal custody over the objection of one parent." *Id.* It was unwilling to grant either parent "veto power" over such a possibility.

*[W]e are unwilling to fashion a hard and fast rule that would have the effect of granting to either parent veto power over the possibility of a joint custody award.* A caring parent, believing that sole custody is in the best interest of the child, may forcefully advance that position throughout the litigation but be willing and able to fully participate in a

joint custody arrangement if that is the considered decision of the court.

306 Md. at 308, 508 A.2d 964 (emphasis supplied).

■ The Mother's reluctance to share legal custody, moreover, does not come across to us as an adamantine or Shermanesque refusal to participate in the event that such an arrangement were to be ordered by the court. She had moved, after all, for sole legal custody in herself and her position on joint custody, expressed in her brief, simply supports that position.

All pleadings filed by Appellant in this matter have been uniform in *her belief that an award of joint legal custody in this matter is inappropriate* and not in Jessica's best interests. *Appellant's request for sole custody* is certainly supported by the parties inability to communicate, as set forth more fully above, and *should not have been discounted by the trial court.*

(Emphasis supplied). A mere reluctance to participate in an arrangement is not tantamount to a refusal to participate and should not be given the same weight as the judge assesses the prospects for a successful resolution.

### The Ability to Communicate Effectively

■ The other factor cited by the Mother as a contraindication of joint legal custody is the inability of the Mother and Father to communicate effectively with each other. This is a *Taylor v. Taylor* factor that is particularly pertinent to joint legal custody.

This is clearly the most important factor in the determination of whether an award of joint legal custody is appropriate, and is relevant as well to a consideration of shared physical custody. *Rarely, if ever, should joint legal custody be awarded in the absence of a record of mature conduct on the part of the parents evidencing an ability to effectively communicate with each other concerning the best interest of*

*the child,* and then only when it is possible to make a finding of a strong potential for such conduct in the future.

306 Md. at 304, 508 A.2d 964 (emphasis supplied).

It is that "rarely, if ever, ..." dictum from *Taylor v. Taylor,* underlined above, on which the appellant essentially hinges this appeal. The trial judge would obviously need a substantial basis for looking beyond the surface appearance of poor communication.

In this case, the actual "track record" of the Mother and Father for effective communication had been, to be sure, abysmal. Indeed, on September 7, 2001, Judge Sundt deferred making a final decision on joint legal custody for six months and ordered both the Mother and the Father to "work with a parent coordinator, Dr. Linda Gordon," whose "primary purpose shall be to facilitate communication between the parties, to reduce the conflict between the parties."

It was the relative optimism of Dr. Gordon, six months later, based on improvements in the attitude of both parties, that persuaded Judge Sundt to award joint legal custody. It was of the prognosis for communicative improvement based on the diminution of tension that *Taylor v. Taylor* spoke, 306 Md. at 307, 508 A.2d 964.

Ordinarily the best evidence of compatibility with this criterion will be the past conduct or "track record" of the parties. We recognize, however, that *the tensions of separation and litigation will sometimes produce bitterness and lack of ability to cooperate or agree. The trial judge will have to evaluate whether this is a temporary condition, very likely to abate upon resolution of the issues, or whether it is more permanent in nature.*

(Emphasis supplied).

Notwithstanding an actual escalation of tension, *Barton v. Hirshberg,* 137 Md.App. at 27, 767 A.2d 874, affirmed an award of joint custody on the basis of a trial judge's reasonable expectation of communicative improvement.

Admittedly, tensions and disagreements between the parties have escalated. Nevertheless, *after hearing the testimony, and judging the credibility and demeanor of the witnesses, the trial court concluded that the parties could resolve their differences and act together* in [the child's] best interest.

(Emphasis supplied).

In this case, Judge Sundt found that, after six months of the parties' working with Dr. Gordon, there had been "enormous improvement" in their ability and willingness to communicate with each other. The Court said:

[A]t this most recent hearing *what I heard was that there had been enormous improvement* in that respect.

Linda Gordon talked about the successes first, the fact that there had been sharing of information, and the way the she had institutionalized that was through faxes on a weekly basis, so that the parties could communicate as to what was going on with Jessica.

She talked about the reduction of conflict and strategies that she had been working with the parties on, even small language strategies, so that Mrs. McCarty, who has demonstrated, by both experts' testimony, real learning skills in handing off Jessica—even there, in small nuances of language, could turn a phrase so that it might appear more positive than pejorative as she is getting Jessica ready to go on visits—and certainly with Mr. McCarty, who had a longer road to travel, doing whatever he could to, if not mask his hostility toward his wife, at least put on a civil face and address her and in a tone of voice that would not be threatening or would not be perceived as frightening.

(Emphasis supplied).

■ In a case in which there is not an established "track record" of good communication, *Taylor v. Taylor,* 306 Md. at 307, 508 A.2d 964, stressed that the trial court must articulate the bases for any optimistic expectation on its part that the situation will improve.

In the unusual case where the trial judge concludes that joint legal custody is appropriate notwithstanding the ab-

sence of a "track record" of willingness and ability on the part of the parents to cooperate in making decisions dealing with the child's welfare, *the trial judge must articulate fully the reasons that support that conclusion.*

(Emphasis supplied).

In this case, Judge Sundt did just that. She pointed to 1) the fact that the tensions of litigation were subsiding and 2) the continuing help of a third party:

> With respect to legal custody, Linda Gordon acknowledges that the parties are having difficult making decisions, even communicating without the help of a third party now, but *it was her very clear statement that two factors—(1) Once the litigation subsides and (2) with the continuing help of a third party, they could make decisions together.*

And the alternative, in her mind, was far worse.

(Emphasis supplied).

 In terms of that third-party help, part of Judge Sundt's final order, moreover, was her firm directive that both parties must continue, at their own mutual expense, to work with Dr. Gordon for an additional six months in the effort to improve their communicative skills. Judge Sundt was emphatic:

> Neither one of you is to make a major decision without consulting the other, and, as I said, if you run into an impasse, that is the time you meet with Dr. Gordon.

> I want you to meet with her no fewer than 10 times over these six months. So, that is roughly every other week.

Judge Sundt's final decision with respect to joint legal custody was clear:

> I think you have made huge strides. I think that in the best of all worlds, some therapy for each of you could help you, but I am not going to order you into therapy.

> *I think you can do legal custody.* This is not the usual case, because the primary factor in joint legal custody has to do with valuing and respecting each other so that you can actually confer and consult.

But *I am relying on Linda Gordon in this respect.* Her sense was that to the extent that it is situational, that is that the conflict is situational, and to the extent that you have been able to move past that and that there are ways of communicating without having to do it face-to-face and certainly not in Jessica's presence, it will come.

And I tend to adopt her view that the alternative is worse—that a period of time right now for one of you to be making the decisions without the other's input will be perceived as such disrespect and such disregard that the conflict will not abate—that the only way that conflict is going to abate is with your having to be civil, courteous, and respectful.

*I am going to keep Linda Gordon in the case for six months, and she will be the person to whom you funnel the impasse.*

(Emphasis supplied).

We cannot say that Judge Sundt's decision constituted a clear abuse of discretion. The communicative situation, to be sure, was marginal. On the other hand, Judge Sundt, who had been closely in touch with the situation for over a year, was engaged in energetic measures—for six months prior to her award of joint legal custody and for a projected six months of post-award follow-up—to insure that the communicative situation was brought up to an acceptable level. That effort is highly commendable, and only time will tell whether it may turn out to be effective and ultimately beneficial to all parties, particularly Jessica. In the words of Judge Digges in *Davis v. Davis,* 280 Md. at 132, 372 A.2d 231, we will not "substitute our judgment for that of the chancellor." We affirm.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**