846 A.2d 1

**Lawrence J. BREWER, Jr.**

v.

**Gretchen K. BREWER.**

**No. 2704, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

March 31, 2004.

82

Vincent M. Wills (Patrick W. Dragga, Kevin G. Hessler, on the brief), Rockville, for appellant.

Bryan Renehan (Brodsky, Greenblatt & Renehan, on the brief), Gaithersburg, for appellee.

Panel: JAMES R. EYLER, KRAUSER, SHARER, JJ.

KRAUSER, Judge.

The Circuit Court for Montgomery County granted appellee, Gretchen K. Brewer, an absolute divorce from appellant, Lawrence J. Brewer, Jr. It then divided the parties' assets, awarded Mrs. Brewer indefinite alimony, and granted her a monetary award—all to the parties' mutual dissatisfaction. Indeed, the only action taken by the court of which the parties appear to approve was the grant of the divorce itself. And their cross appeals reflect their displeasure.

In his appeal, Mr. Brewer challenges the trial court's award of indefinite alimony, its grant of a monetary award, and various aspects of the court's division of the parties' property. His challenges are contained in four questions he presents for our review. Stripped of argument and reworded, they are: [1]

I. Did the trial court abuse its discretion in awarding indefinite alimony of $1,500.00 per month to Mrs. Brewer?

II. Did the trial court err in granting Mrs. Brewer a monetary award of $175,000.00?

---

1. Question III in this opinion does not match what Mr. Brewer designated as question III in his brief but does comport with what he designated as argument III in his brief. In structuring his argument, Brewer did not address question III separately but included it in his discussion of question II. To avoid confusion, we have addressed the questions raised as they are actually presented and discussed in the argument section of his brief.

III. Did the trial court err in failing to decree Mr. Brewer's ownership interest in the furniture that he inherited from his parents and in failing to order Mrs. Brewer to return that property to Mr. Brewer?

IV. Was the trial court's finding, that Mr. Brewer had given Mrs. Brewer jewelry that he inherited from his mother, clearly erroneous?

In her cross-appeal, Mrs. Brewer also challenges the alimony award, the monetary award, and aspects of the court's division of the Brewers' property. But she takes the dispute one step further and questions the court's failure to award her counsel fees. Her objections are contained in the four questions she poses. Edited for swift apprehension, they are:

V. Did the trial court err in failing to make an award of counsel fees to Mrs. Brewer?

VI. Did the trial court err when it granted Mr. Brewer's motion for reconsideration and reduced its monetary and alimony awards?

VII. Did the trial court err in finding that Mr. Brewer did not give the furniture he had inherited to Mrs. Brewer?

VIII. Did the trial court err in failing to impute a higher rate of return to Mr. Brewer's investment assets?

For the reasons set forth below, we shall vacate the trial court's grant of indefinite alimony and a monetary award and remand this case to that court for reconsideration as outlined by this opinion. We shall also vacate the trial court's denial of counsel fees so that it may reconsider that denial in light of any changes it may wish to make to the alimony or monetary award on remand.

## Background

The parties were married on September 24, 1966. They have two children, Mark and David, who are now adults. In December 2000, after almost thirty-five years of marriage, Mrs. Brewer moved out of the marital home. Two months later, Mrs. Brewer filed for an absolute divorce.

At the time of the trial, Mr. Brewer was sixty-three years old. He has a bachelor of science degree in electrical engineering and has completed course work for a master's degree in industrial administration. During the marriage, Mr. Brewer was, in the words of the trial court, the "primary breadwinner" of the family. From 1973 to 2000, he worked for BAE SYSTEMS North America. And, in December 2000, he retired from his position as a "project manager" for that company.

At retirement, Mr. Brewer was earning approximately $85,000 per year. He now receives, monthly, $1,381 in Social Security benefits; $1,832 in pension benefits from BAE SYSTEMS; and $833 per month in investment income, for a total of $4,046 per month. Apart from his monthly income, Mr. Brewer has substantial assets, having recently inherited, upon the death of his mother a little more than a year before the parties separated, three quarters of a million dollars.

Mrs. Brewer is two years younger than her former husband. She was sixty-one years old at the time of the trial. She has a bachelor of science degree from Columbia University and a master of science degree in human behavior from the University of Maryland. Both of these degree programs included training in the field of nursing. When the parties married, Mrs. Brewer was working full-time as an instructor in a nursing program. But, after the birth of the parties' first son in 1969, Mrs. Brewer stayed at home for a year and a half to care for him. Thereafter, she worked part-time as a visiting nurse.

After the birth of the parties' second son in 1973, she again stayed at home, this time for two years, to care for both children. When she returned to the workforce in 1975, she worked part-time as a nurse so that she could attend graduate school. Upon completing her master's degree in 1979, Mrs. Brewer took a full-time position at the National Institutes of Health, where she worked as a "clinical educator." She held that position for approximately five years, before accepting a position in 1984 as a "project director" with a consulting firm.

The "tremendously demanding" hours of that job caused her to seek an alternative form of employment after working there only a year and a half. The parties agreed that Mrs. Brewer would "do something perhaps from home" where she could supervise the parties' then-teenage sons. That led to a job with Mary Kay Cosmetics.

Although Mrs. Brewer began selling Mary Kay Cosmetics on a part-time basis, she eventually assumed a full-time position with Mary Kay. For the last seventeen years she has worked for Mary Kay and presently serves that organization as a full-time sales director. She is technically classified as an independent contractor, and her salary is based on commission. She earns, according to her financial statement, $1,054.92 per month. But that is not her only source of income. Having reached the age of sixty-two during these proceedings, she is now eligible for social security benefits.

The marriage was troubled almost from the start. Mrs. Brewer testified that Mr. Brewer physically abused her throughout the marriage. That abuse began, she maintained, as early as her pregnancy with the parties' second son in 1973 and continued until 1999, a year before the parties separated. Indeed, Mrs. Brewer claimed that she left Mr. Brewer because of the physical abuse, fearing that it would only increase after his retirement. At trial, Mr. Brewer "accept[ed] responsibility for the acts of violence." In fact, he conceded: "I think [Mrs. Brewer] left because of the physical abuse and the fact that we were incompatible."

On December 13, 2000, the parties separated. On that date, Mr. Brewer arrived home to find the house empty and Mrs. Brewer gone. She left, taking with her $17,000 from the parties' Vanguard Prime Money Market Fund and drawing down $74,000 from the their home equity line of credit.

### The Proceedings

After leaving the marital home, Mrs. Brewer filed a complaint for absolute divorce, alleging voluntary separation and constructive desertion, and seeking a resolution of all disputes

between the parties with respect to ownership of property, a division of the parties' pension and retirement funds, *pendente lite* and permanent alimony, counsel fees, health insurance coverage, and a monetary award.

The trial court granted Mrs. Brewer an absolute divorce from Mr. Brewer on the grounds of constructive desertion, explaining that "the living conditions were made virtually unbearable by the way Mr. Brewer, by his own admission, treated his wife during the years of a long, long, marriage." It then awarded Mrs. Brewer indefinite alimony in the amount of $2,000 per month. In granting that award, the trial court stated:

> The first thing the Court must consider is the ability of the party seeking alimony to be wholly or partly self-supporting.

> The Court finds that Mrs. Brewer, the plaintiff in this case, is clearly capable. She is capable of being self-supporting, but clearly not at this juncture.

> The Court does not sit in a vacuum. The Court is not isolated from the rest of society. The Court realizes—and I find it appropriate for judicial notice—that there are great disparities between the genders with respect to the opportunity in the employment market.

The trial court then observed:

> [T]he notion that a woman in her 60s could simply step out, so to speak, and be gainfully employed in a career at this juncture, it is possible.

> People do it, but it will be difficult to do, and so I do find that while on the one hand she is capable of being self-supporting, that is not something that she will imminently be able to.

Turning to the question of how much time Mrs. Brewer would need to gain sufficient training or education to enable her to find suitable employment, the court stated:

The second factor is the time necessary for the parties seeking alimony to gain sufficient education or training to enable that party to find suitable employment.

Well, the education and training factor is also an area that there is great gender disparity in our country, particularly with—I hesitate to characterize what the 60s are.

I am not going to say whether it is old or young. I am rapidly approaching that myself, but we know that it is— many things in life that were easier when we were younger become more difficult when we are older, and that is a factor that the court certainly must consider.

Notwithstanding that, there was no testimony given that Mrs. Brewer plans with respect to going back to school or anything of that nature.

The court then considered the standard of living of the parties and their respective contributions to the well-being of the family:

Now, the standard of living the parties have established during the marriage, the third factor the Court must consider, the parties in this case lived nicely.

They did not live lavishly. Mr. Brewer was the primary breadwinner, to use that phrase, and Mrs. Brewer, during the times that she was working, contributed to the economic well-being of the family.

The duration of the marriage, this is a long marriage, and it is sad that it ends, but it is a long marriage, from 1966.

The contributions, monetary and non-monetary that each party made. Now, our Court of Appeals has told us that we must consider those factors, but they don't tell us how to do it.

How do you put a value on the non-marital [sic] contribution that a party makes in a marriage? It is difficult, but we are required to do that, and the Court will consider that.

* * *

[Mr. Brewer] said that [Mrs. Brewer] was essentially a good mother. That is a non-monetary contribution, even though it does have monetary consequences.

If you take good care of your family, it saves the family money. If you manage the home well, it puts the family in a better economic position, and Mr. Brewer had no compunctions about doing that.

As for the circumstances that contributed to the estrangement of the parties, the court opined:

Well, there has been enough said during the course of this case regarding the conduct of Mr. Brewer with his perhaps frustrations with his job, frustrations and difficulties of doing a very difficult job, that is being the head of a family, raising a family.

Mr. Brewer didn't handle those frustrations very well. That is not a criticism of Mr. Brewer. That is simply a finding of fact, and the way he handled problem-solving in the family largely contributed to the estrangement of the parties.

* * *

The court then addressed the age of the parties, compared their financial resources, and determined whether any agreement existed between them as to those resources:

The age of the parties, I suppose we could say in the words of the poet, when we reach this point in our lives, our days are in the yellow leaf, but fall is certainly a long time, and that certainly factors into alimony, and will certainly inure to the benefit of Mrs. Brewer.

The ability of the party from whom alimony is sought to meet the needs while meeting his or her own needs. If I might just go forward very quickly there is some disparity between the way [Mrs. Brewer] assesses the value of the property that [she] and [Mr. Brewer] get in this case, but the one thing that the [parties] do agree on is that there is great disparity between the value of the property—that is,

when you look at the splitting of the marital property, and the value of the property that the parties have that is non-marital.

There is a great disparity between Mr. Brewer and Mrs. Brewer. After going over the property—and I am not jumping out of the alimony part of the opinion, I am just parenthetically, if you will, mentioning how the property and the money that the parties have, value that the parties have, fits into the alimony equation.

All of the assets of Mr. Brewer after the division of the marital property, plus the non-marital property that he has, will yield him $811,742.50.

Mrs. Brewer, after the splitting of the marital property, and the adding of the property that she has that is non-marital, which isn't very much, her assets are going to be worth $115,101.50.

So you can see that is a great disparity. So the ability of Mr. Brewer to make alimony payments, and to take care of his own needs, is clearly there.

He has that ability. There is no agreement between the parties, and that is often an interesting factor why the legislature included this in.

If there was an agreement between the parties, we wouldn't have had a trial. But that is a factor that the Court must consider.

The Court considers there was no agreement. The financial needs and resources of each party, including all income and assets, all income and assets, not just necessarily liquid assets, but all the income and assets that the parties have, including property that does not produce income.

The Court must also consider any award under Section 8–205. There will be a monetary award in this case, and I say that with respect to—so the parties can see the adjustment the court made.

The court considered the right of each party to receive retirement benefits:

The retirement benefits of the parties in this case will be dealt with by QDROs which will be submitted by counsel at the appropriate time for the Court's consideration.

I will mention that again, but the parties have already agreed with respect to the BAE pension of Mr. Brewer that that is going to be divided by QDRO, on a 50–50 basis, and that counsel will certainly submit the QDROs, which are the last things that are submitted in these cases.

Having considered the statutory factors for making an award of alimony, the court awarded Mrs. Brewer indefinite alimony in the amount of $2,000 per month. Turning its attention to the parties' marital home, which they owned as tenants in common,[2] the trial court declared:

The property will be sold. The Court will order that the house be sold. I am not going to appoint a trustee. The parties will be able to do that.

\* \* \*

Now, there was an argument about what the value of the home is, and I don't know what the value of the home is. That was argument or suggestion by both counsel.

The house clearly will have to be valued. The parties will cause that to happen, and I find that the parties at this point in this case, they will be able to do that by agreement.

Now, there was $10,800 of that that went into that house that was non-marital money that Mr. Brewer put in [from his inheritance].[3] He is obviously entitled to that money back upon the sale of the marital home, and the parties will then divide the proceeds form the sale of the marital home equally.

Parenthetically, we note that the trial court later appointed a trustee to handle the sale of the parties' home, which had an

---

**2.** In 1992, the parties reconveyed the marital home to themselves as tenants in common for estate planning purposes.

**3.** Mr. Brewer testified that he used $10,800 of his inherited funds to pay off the mortgage on the marital home.

appraised value of $496,000. Mrs. Brewer purchased the house for $505,000. The net proceeds from that sale left the parties with $192,025.00 each.

As for the parties' remaining property, that is, Mr. Brewer's pension, the parties' IRAs, various accounts, jewelry, furniture, and other items, the court stated:

Now, with respect to the furniture, the parties agree that the furniture is marital property valued at $4,500.

The furniture should be sold, and the proceeds shall be divided equally between the parties. Counsel commented parenthetically regarding the appointment of trustees and sale of property, and it perhaps may have been off the record that the lawyers will make sure they don't have to get trustees involved in that.

\* \* \*

Business furniture, the parties agree that the business furniture is marital property valued at $200. That furniture will be sold.

The proceeds shall be divided equally, unless of course one of the parties buys the other out. Office computer, the parties agree that the office furniture and computer is marital property.

\* \* \*

With respect to the jewelry that the parties agree to be marital property, the parties disagree as to the value of the property.

[Mrs. Brewer] asserts the value of the property to be $3,000. [Mr. Brewer] asserts the value to be $8,100. The Court, at the risk of any allegations of gender bias, I am going to accept the value as asserted by [Mrs. Brewer], and that property likewise, if the parties can't agree, would be sold and divided equally.

The SEP IRA account, that account will be dealt with by way of a QDRO. The Vanguard IRA account also will be dealt with by way of a QDRO which the parties will submit at the appropriate time.

Likewise, the rollover IRA Vanguard account will be dealt with by QDRO. The pension BAE account, the parties have agreed that it would be divided and dealt with by QDRO.

They have agreed on the dispersion of that. With respect to the Century Bank checking account, the parties agree that the Century Bank checking account is marital property.

\* \* \*

With respect to the Vanguard money market fund, [Mrs. Brewer] asserts a value of $40,230. There was no other value given by [Mr. Brewer].

Therefore, the Court will accept the value of [Mrs. Brewer], the value being $40,230 divided equally between the parties.

There is another Vanguard money market fund. The parties agree that it is marital property, $8,632—and by the way, disregard that.

That will be divided equally between the parties. The Vanguard Prime money market fund, the parties agree that it is marital property on their joint property statements, that the value is $23,870.

[Mr. Brewer] asserts on his statement that the value is $21,128. The Court finds that the value of the prime money market fund to be $22,499.

That shall be divided equally between the parties. The Scudder Gold Fund proceeds, the parties agree that that is marital property valued at $2,926.

The value of the account shall be divided equally between the parties. The Potomac Valley Bank proceeds, the parties agree is marital property valued at $4,306.

The value of the account is $4,306. Needs to be divided between the parties. With respect to the Potomac Valley Bank account, the parties agree the bank account is marital property, $1,906, the value of that account, shall be divided equally.

Let me say parenthetically with respect to these accounts, the interest of which and so forth is being computed on a daily basis.

The Court and counsel will instruct their clients that these exact figures may be slightly off, but what the parties should get is if it is marital property, regardless of what the amount is at the entry of this judgment, that it is to be divided equally.

In other words, if for example the Potomac Valley account, which had $4,306 in it at the time of filing is now down to $2,000, it is marital.

The parties simply divide it equally. That is what you should take from this, and not get hung up on the exact figure that is in the account, and I am sure you understand that.

\* \* \*

The parties agree that there was a savings bond. It was marital property. Neither party provided a value of that property.

The savings bond have [sic] any value at this point, it shall be divided equally.

\* \* \*

Jewelry. The parties agree that the particular jewelry is [Mrs. Brewer's], which was acquired by inheritance.

[Mrs. Brewer] asserts the value of $11,000. There was no other value given by [Mr. Brewer]. Therefore, the Court will accept the value given by [Mrs. Brewer].

The Court finds that the jewelry valued at $11,000 is non-marital and [Mrs. Brewer's].

\* \* \*

Now, with respect to the money that was placed in the Vanguard account that was inherited by Mr. Brewer, at the time some $702,239, [Mr. Brewer] asserts that that money is non-marital.

The Court finds that it is non-marital. The amount at this point totals to be some $690,417. That is non-marital,

and that of course is Mr. Brewer's, and remains in Mr. Brewer's column.

Now, I have already indicated that the retirement accounts will be dealt with by way of a QDRO on an i[f], as and when basis.

Those QDROs will be submitted at the appropriate time by counsel.

Also at issue were several items that Mr. Brewer inherited from his mother upon her death in 1999. Among the things she left him were certain items of jewelry. Although Mr. Brewer claims that he never gave that jewelry to Mrs. Brewer, Mrs. Brewer testified otherwise. She asserted that, after Mr. Brewer's mother died, "[Mr. Brewer] handed the jewelry to [her], and said, '[h]ere. I want you to have the jewelry. Feel free to use it, Wear it. Enjoy it.'" She further stated that her mother-in-law was "like a second mother" to her and the two were "very close." As for this jewelry, the trial court declared:

The Court accepts the testimony of all the witnesses who testified regarding the relationship between Mrs. Brewer and Mr. Brewer's mother, her mother-in-law.

It was very clear during this trial that Mrs. Brewer, notwithstanding the difficulties that she and Mr. Brewer were having, that did not spill over and taint the relationship between Mrs. Brewer and Mr. Brewer's mother.

That relationship to the very end continued to be a good relationship. The jewelry that Mr. Brewer inherited, the Court finds, based upon the testimony, that at that point in time, because of the relationship that Mr. Brewer knew that his wife had with Mr. Brewer's mother, I believe that his mother would have wanted Mrs. Brewer to have that jewelry, and he gave it to her, and he cannot now at the time of divorce take it back and claim that it is non-marital.

Mr. Brewer also inherited from his mother a substantial amount of furniture. Mrs. Brewer testified that this furniture replaced "literally everything in the house ... [the] [b]eds we slept on, living room furniture, dining room furniture, family

room [furniture], [and the] kitchen [furniture]." Although Mrs. Brewer argued that Mr. Brewer made a gift of the furniture to the marriage, the trial court disagreed and found that, unlike the jewelry, there was no evidence that Mr. Brewer ever intended to make such a gift. It concluded that the property was non-marital and belonged to Mr. Brewer.

The trial court granted Mrs. Brewer a monetary award of $250,000, explaining:

> The law provides that to balance or to prevent any inequities between the parties upon the dissolution of a marriage, the court can grant a monetary award, and the court will grant a monetary award in this case.

> This is a two stage process. The Court must first value the property and assets that the parties have, and then after that, the court must consider certain relevant factors in granting the monetary award.

> In issuing a monetary award, the Court must necessarily consider the ability of the person who is going to be ordered to pay the monetary award, the ability of that individual to pay the monetary award.

> The court in this case finds that Mr. Brewer clearly has the ability in this case to pay a monetary award. The Court also considers in granting a monetary award—and here is that factor again—the non-monetary factors that the party who is going to be granted the award, what did they contribute to the marriage over the duration of a marriage.

> The marriage lasted since 1966, and as I said with respect to alimony, the Court of Appeals tells the court that we must consider the non-monetary contribution but they don't tell us how to do that.

> Essentially, you have to place a value on an individual's contribution during the course of the marriage. Now, when I say that, I say that—that has to be done within the context of what is available for the issuance of a monetary award.

> Clearly, we don't sit here and value people's worth. You can't do that, but the value is considered in the context of what is available to pay a monetary award.

The Court in this case considers the assets that are available, the vast disparity between the assets of the two parties as they get this judgment of divorce, which the court will sign effective today's date.

Having gone through the value of the property with respect to the parties' assets, having determined that there is a great disparity between those of [Mr. Brewer], Mr. Brewer and Mrs. Brewer in this case, having determined that there is the ability to pay a monetary award, having determined that the non-monetary contributions made by Mrs. Brewer during the course of this marriage were substantial, the court will award a monetary award in the amount of $250,000.

After these findings and rulings were memorialized in a written Judgment of Absolute Divorce, Mr. Brewer filed a motion to alter or amend that judgment. Granting that motion in part, the court reduced Mrs. Brewer's indefinite alimony award from $2,000 to $1,500 per month and her monetary award from $250,000 to $175,000 without explanation. It also ordered the parties to evenly divide Mr. Brewer's pension and their respective IRA accounts and to pay their own attorney's fees.

In the end, according to our calculations, excluding the BAE pension, Mrs. Brewer received approximately $500,000 of the marital property, while Mr. Brewer received approximately $170,000 of the marital property. As for non-marital assets, however, at the time of the divorce, Mr. Brewer had approximately $700,000 in non-marital assets, while Mrs. Brewer had only $18,500 in non-marital assets. After the court divided the marital property, Mr. Brewer was left with a net worth of approximately $870,000, comprised mostly of the monies he had inherited from his parents, while Mrs. Brewer's net worth rose, according to our calculations, to approximately $518,000, comprised almost entirely of what was marital property.[4]

---

**4.** As we shall later discuss at greater length, these figures include the property that the trial court erroneously excluded from its judgment,

## I

Mr. Brewer contends that the trial court's award of indefinite alimony, in the amount $1,500.00 per month to Mrs. Brewer, is fraught with error. That award, he maintains, was made in the absence of any "findings regarding [Mrs. Brewer's] income, the time necessary for [Mrs. Brewer] to become self-supporting, the income that [Mrs. Brewer] could potentially obtain, and whether an unconscionable disparity existed" as required by FL § 11–106(c). Even if the court had made the required findings, he adds, the court's award of alimony is unsustainable "because there was no unconscionable disparity and [Mr. Brewer] does not have the ability to pay alimony."

 Although, in reviewing an award of alimony, we "defer[ ] to the findings and judgments of a trial court," we may disturb an award of alimony if we conclude that in making that award "the trial court abused its discretion or rendered a judgment that is clearly wrong." *E.g., Innerbichler v. Innerbichler,* 132 Md.App. 207, 246, 752 A.2d 291 (2000) (quoting *Digges v. Digges,* 126 Md.App. 361, 386, 730 A.2d 202 (1999)). The evidence supports such a conclusion here.

We begin our review of the award at issue by noting that FL § 11–106(b) provides that, in determining whether to make an alimony award, the trial court shall consider twelve factors. With respect to those factors, this Court has stated:

In making an award of alimony, the trial court is required to consider all of the factors set forth in F.L. § 11–106(b). To be sure, the court "need not use formulaic language or articulate every reason for its decision with respect to each factor. Rather, the court must clearly indicate that it has considered all the factors." If the court fails to make clear that it has considered all of the factors, then the record, as a

namely, the marital portion of Mr. Brewer's Vanguard Money Market account, his savings bond, and Mrs. Brewer's jewelry, and exclude the property that the trial court erroneously included as marital property in the judgment, namely, the Joint Vanguard Money Market Account.

whole, must reveal that the court's findings were based on a review of the statutory factors.

*Digges,* 126 Md.App. at 387, 730 A.2d 202 (citations omitted) (quoting *Doser v. Doser,* 106 Md.App. 329, 356, 664 A.2d 453 (1995)); *see also Rogers v. Rogers,* 80 Md.App. 575, 591, 565 A.2d 361 (1989).

The twelve factors are:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial needs and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under §§ 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits; and

(12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19–301 of the Health–General Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

FL § 11–106(b).

■ ˙ Factor eleven provides that the court shall consider "the financial needs and financial resources of each party, including all income and assets...." *Id.* § (11)(i). In so doing, the trial court must "make specific findings of fact with regard to the income of the recipient spouse." *See Reuter v. Reuter,* 102 Md.App. 212, 229, 649 A.2d 24 (1994). Otherwise, as this Court has previously noted, we are unable to determine whether the trial court's findings are clearly erroneous. *C.f. id.* at 236, 649 A.2d 24.

After considering the twelve factors, the trial court must then decide whether to grant rehabilitative or indefinite alimony. A court may award the latter if it finds:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

FL § 11–106(c).

■ But "the purpose of alimony," the Court of Appeals reminds us, "is not to provide a lifetime pension." *Tracey v. Tracey,* 328 Md. 380, 391, 614 A.2d 590 (1992). It is designed "to provide an opportunity for the recipient spouse to become self-supporting." *Id.* (quoting the Report of the Governor's Commission on Domestic Relations 2 (1980)). However, "[i]n cases where it is either impractical for the dependent spouse to become self-supporting, or in cases where the dependent spouse will be self-supporting but still a gross inequity will exist, a court may award alimony for an indefinite period."

*Roginsky v. Blake–Roginsky,* 129 Md.App. 132, 141, 740 A.2d 125 (1999).

■ As Mr. Brewer claims, the trial court failed to make any finding as to Mrs. Brewer's current income, or as to when she might become self-supporting, or, as to whether, once that occurred, there would be an unconscionable disparity in living standards. After discussing the difficulties that a woman in her sixties would face in becoming "gainfully employed in a career," the court noted that, at her age, Mrs. Brewer would have difficulty obtaining additional education and training. But it did not find that Mrs. Brewer had made as much progress toward becoming self-supporting as can reasonably be expected. In fact, it opined only that she would not "imminently" become self-supporting without expressing any view as to when that might be or what future income she might make or concluding that, at her age, full time employment for any significant period was not a reasonable expectation. As for the last point, the court seemed to suggest that, at her age, full time employment is not an option but then fails to make that finding.[5]

Nor did the trial court make any findings with respect to Mrs. Brewer's present income, as required by FL § 11–106(b)(11). *See Reuter,* 102 Md.App. at 229, 649 A.2d 24. According to Mrs. Brewer's financial statement, her gross monthly income at the time of the divorce was $1,054.92. She confirmed that figure at trial, testifying that the statement "fairly and accurately reflect[ed] [her] income." While Mr. Brewer does not challenge the accuracy of that figure, he

---

5. In *Benkin v. Benkin,* 71 Md.App. 191, 524 A.2d 789 (1987), this Court considered the ability of a fifty-six year old wife, who had not been employed outside the home for almost twenty-five years, to become self-supporting. *Id.* at 203, 524 A.2d 789. We noted that "[r]eentry into the job market for a woman of fifty-six years, even in excellent health, is problematic." *Id.* In contrast to Mrs. Benkin, Mrs. Brewer was sixty-one years old, five years older than Mrs. Benkin, at the time of trial. It was certainly within the court's discretion to consider Mrs. Brewer's age in determining whether she had made all of the progress towards becoming self-supporting as could reasonably be expected, but, as noted, the court made no such finding.

points out that it is unclear whether the trial court considered Mrs. Brewer's eligibility for social security benefits or her receipt of half of Mr. Brewer's pension. And the record supports his concerns.

At trial, the court admitted into evidence a copy of Mrs. Brewer's Social Security benefits statement, which indicated that at age sixty-two—an age that she would reach within one year—Mrs. Brewer would be entitled to receive, based on her earnings alone, $496 per month in benefits. But, as Mr. Brewer points out, she may be entitled to more. Under the Social Security regulations, Mrs. Brewer can reject the $496 per month, in favor of receiving an amount equal to one half of Mr. Brewer's benefits, or $690.50 per month, once she reaches her full retirement age, which, in her case, is sixty-five and a half years old.[6] 20 C.F.R. §§ 404.333, 404.409. If she elects to receive benefits before that age, she would receive a little less.[7] 20 C.F.R. § 404.410.

Moreover, her employment does not preclude her from receiving these benefits, although it may result in a small reduction in benefits as her income of $12,648 exceeds the $11,240 annual income limit set by the Social Security Administration. *See* Social Security Administration, *Exempt Amounts Under the Earnings Test, at* www.socialsecurity.gov/OACT/COLA/rtea.html. For every two dollars above that limit, the Social Security Administration reduces benefits by one dollar. *Id.* On the other hand, this small reduction will not, in this instance, last long. Beneficiaries have no limit

---

6. As a divorced spouse, Mrs. Brewer would be still eligible to receive half of Mr. Brewer's benefits, but only after the parties have been divorced for two years. 20 C.F.R. § 404.331. This would not reduce Mr. Brewer's benefits.

7. For example, if Mrs. Brewer chooses to receive benefits at age sixty-two, she would only be entitled to an amount equal to 36.3% of Mr. Brewer's benefits. Social Security Administration, *How Your Security Benefit is Reduced, at* www.ssa.gov/retirement/1940.html. If she were to put off receiving benefits until she turns sixty-four, she would be entitled to an amount equal to 43.8% of his benefits. *Id.*

on their earnings after they reach their full retirement age. *Id.*

In addition to these benefits, Mrs. Brewer will also be receiving half of Mr. Brewer's BAE pension, which will pay her $919 per month, as well as the $36.83 in monthly dividends from her own investments. Thus, assuming that Mrs. Brewer elects to receive only $496 in benefits based solely on her earnings history, Mrs. Brewer's monthly income, according to our calculations, would be approximately $2,500. Her income could, however, be higher than that amount if she waits to begin receiving her Social Security benefits until she reaches full retirement age. But regardless of her exact entitlement, it is not clear, as Mr. Brewer asserts, that the trial court considered these other sources of income, as it made no findings as to her present or future income.

In contrast to Mrs. Brewer, Mr. Brewer earns $3,130.89 per month. That means, according to our computations, that Mrs. Brewer's monthly income, less the alimony awarded by the trial court, is almost 80% of Mr. Brewer's. But, as noted above, it could be even greater than that.

This is hardly a gross disparity. Although admittedly a mathematical comparison of income is only the starting point for finding an unconscionable disparity in living standards, *Blaine v. Blaine,* 336 Md. 49, 71–72, 646 A.2d 413 (1994), it is worth pointing out that there are no reported Maryland decisions that have upheld an award of indefinite alimony when such a small disparity in the parties' incomes exists.[8]

---

8. In *Lee v. Lee,* 148 Md.App. 432, 448–49, 812 A.2d 1089 (2002), *cert. denied,* 374 Md. 83, 821 A.2d 371 (2003), this Court noted:

In ascending order, Maryland cases have found that the chancellor did not err in granting indefinite alimony to a spouse whose potential income, when compared to the non-dependent spouse's income, bore the following percentage relationship: (1) 22.7%—*Blaine v. Blaine,* 97 Md.App. 689, 708, 632 A.2d 191 (1993), *aff'd,* 336 Md. 49, 646 A.2d 413 (1994); (2) 25.3%—*Ware v. Ware,* 131 Md.App. 207, 230, 748 A.2d 1031 (2000); (3) 28%—*Tracey v. Tracey,* 328 Md. 380, 392–93, 614 A.2d 590 (1992); (4) 30%—*Digges v. Digges,* 126 Md.App. 361, 388, 730 A.2d 202 (1999); (5) 34%—*Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d 1208 (1983); (6) 34.9%—*Broseus v.*

And it is noteworthy that in cases in which this court upheld an indefinite award of alimony despite a relatively small disparity in income—such as in *Crabill v. Crabill,* 119 Md.App. 249, 704 A.2d 532 (1998), in which the wife's income was 62% of the husband's—the trial court did not grant, as the trial court did here, a monetary award. *Id.* at 252, 255, 704 A.2d 532.

Without making the findings we have outlined, the trial court awarded Mrs. Brewer indefinite alimony, citing the "great disparity" in the parties' respective assets. The trial court found that "all of the assets of Mr. Brewer after the division of the marital property, plus the non-marital property that he has, will yield him $811,742.50," whereas Mrs. Brewer would be left with $115,101.50. But this finding understates Mrs. Brewer's assets. It ignores the $175,000 monetary award which she received, her proceeds from the sale of the marital home, and her share of the parties' IRAs. Indeed, after dividing the IRAs and the proceeds from the sale of the marital home, Mrs. Brewer's assets will equal, according to our calculations, approximately $518,000 compared to Mr. Brewer's assets, which will equal approximately $870,000. This is a substantially smaller disparity than that relied upon by the trial court in awarding Mrs. Brewer alimony.

■ Moreover, even assuming that the trial court correctly found that there was a "great disparity" in the parties' assets, that is not a sufficient basis for awarding indefinite alimony. FL § 11–106(c)(2) requires that, in order to award a spouse indefinite alimony, the court must find that "the respective *standards of living of the parties* will be unconscionably

*Broseus,* 82 Md.App. 183, 196–97, 570 A.2d 874 (1990); (7) 35%—*Bricker v. Bricker,* 78 Md.App. 570, 576–77, 554 A.2d 444 (1989); and (8) 43%—*Caldwell v. Caldwell,* 103 Md.App. 452, 464, 653 A.2d 994 (1995).

*See also Harbom v. Harbom,* 134 Md.App. 430, 458, 760 A.2d 272 (2000)(37%); *Innerbichler v. Innerbichler,* 132 Md.App. 207, 247, 752 A.2d 291 (2000) (less than 10%); *Caccamise v. Caccamise,* 130 Md.App. 505, 512, 747 A.2d 221 (2000) (43%); *Rock v. Rock,* 86 Md.App. 598, 613, 587 A.2d 1133 (1991) (21.7%); *Zorich v. Zorich,* 63 Md.App. 710, 717, 493 A.2d 1096 (1985) (20%).

disparate." (Emphasis added). Here, the trial court did not take the next necessary step and conclude that a "great disparity" in assets would translate into an unconscionable disparity in their respective standards of living. Moreover, such a finding requires the trial court to also consider the parties' income, which, as previously discussed, it failed to do.

For all of these reasons, we must vacate the alimony award so that the court can make the required findings and to determine whether it wishes to award Mrs. Brewer indefinite alimony and if it does, in what amount. Because we are vacating the court's alimony award, we must also vacate its monetary award, as any significant change in alimony requires the court to reassess its monetary award. *Benkin v. Benkin,* 71 Md.App. 191, 208, 524 A.2d 789 (1987). We shall nonetheless address the merits of that award to guide the trial court on remand.

## II

Mr. Brewer contends that "[t]he trial court's determination and valuation of marital property was clearly erroneous, and its monetary award of $175,000 was legally incorrect and an abuse of discretion."

Although the law does not require a court to divide marital property equally between parties, the division of such property must be "fair and equitable." *Long v. Long,* 129 Md.App. 554, 577–78, 743 A.2d 281 (2000) (citations omitted). To achieve that result, a trial court may grant a monetary award "to correct any inequity created by the way in which property acquired during the marriage happened to be titled." *Doser,* 106 Md.App. at 349, 664 A.2d 453. The decision to grant such an award "is generally within the sound discretion of the trial court." *Alston v. Alston,* 331 Md. 496, 504, 629 A.2d 70 (1993). "Unless the chancellor abuses that discretion or makes a ruling contrary to law, the chancellor's decision must stand on any subsequent appeal." *Lemley v. Lemley,* 102 Md.App. 266, 298, 649 A.2d 1119 (1994). We will therefore

not disturb the trial court's order unless we find an abuse of discretion. *See id.*

We shall now address each of the errors that Mr. Brewer maintains the court committed in determining what was marital property, valuing it and, in certain instances, ordering its sale.

### A. Three-step Test

Mr. Brewer first contends that "the trial court erred by not following the three-step process required to establish a monetary award." As evidence of that claim, he principally relies on the trial court's own characterization of the procedure as a "two stage process." But, as we shall see, a misdesignation of that procedure was not tantamount to a misapplication of it.

■ The three-step process, to which Mr. Brewer refers, requires the trial court to determine first which of the parties' property is marital property. Once it completes that task, it must determine the value of all marital property. And then, after considering the factors in FL § 8–205(b), it must decide whether to grant a monetary award. *Harper v. Harper,* 294 Md. 54, 79, 448 A.2d 916 (1982); *Ward v. Ward,* 52 Md.App. 336, 339, 449 A.2d 443 (1982); *see also Doser,* 106 Md.App. at 349–50, 664 A.2d 453.

FL § 8–205(b) states in part:

(b) *Factors in determining amount and method of payment or terms of transfer.*—The court shall determine the amount and the method of payment of a monetary award, or the terms of the transfer of the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both, after considering each of the following factors:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party in accumulating the marital property or the interest in the pension, retirement, profit sharing, or deferred compensation plan, or both;

(9) the contribution by either party of property described in § 8–201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both.

We note, however, that "while consideration of the factors is mandatory, the trial court need not 'go through a detailed check list of the statutory factors, specifically referring to each, however beneficial such a procedure might be for purposes of appellate review.'" *Doser,* 106 Md.App. at 351, 664 A.2d 453 (citations omitted) (quoting *Grant v. Zich,* 53 Md.App. 610, 618, 456 A.2d 75 (1983), *aff'd,* 300 Md. 256, 477 A.2d 1163 (1984)).

Here, the trial court incorrectly stated that it was required to follow a "two stage process" before making a monetary award. It explained: "The court must first value property and assets that the parties have, and then after that, the court must consider certain relevant factors in the granting of a monetary award." Notwithstanding this mischaracterization of the procedure as a two step instead of a three step

procedure, the trial court performed the three steps required by law in granting Mrs. Brewer's alimony award. Before making the monetary award at issue, the court identified the assets that it found to be marital property and explained why it had reached that conclusion as to each item. It then valued each asset. After that, it made findings as to each of the factors set forth in FL § 8–205(b). In sum, if the court erred at all, it was in describing the procedure to be followed—not in applying it.

 Despite the trial court's lengthy discussion of the parties' property before it entered a monetary award, Mr. Brewer argues that the trial court "ignored the requirement that each item of marital property be valued." It is the failure of the trial court to assign a precise value to such things as the parties' accounts that draws his fire. But that failing is understandable and hardly fatal to the monetary award.

We have stated that equity only "requires that reasonable efforts be made to ensure that valuations of marital property approximate the date of judgment of divorce...." *Fox v. Fox*, 85 Md.App. 448, 460, 584 A.2d 128 (1991); *see also Doser*, 106 Md.App. at 348, 664 A.2d 453; *Rosenberg v. Rosenberg*, 64 Md.App. 487, 507, 497 A.2d 485 (1985). And that is what the trial court did here. The Brewers' assets included interest-bearing accounts that were accumulating interest on a daily basis and checking accounts with balances that changed daily. Recognizing the day-to-day fluctuations in value of these accounts, the trial court directed: "The Court and counsel will instruct their clients that these exact figures may be slightly off, but what the parties should get is if it is marital property, regardless of what the amount is at the entry of judgment, that is to be divided equally." Under the circumstances, the trial court used reasonable efforts to approximate the value of the marital property at the date of judgment of divorce.

### B. The Sale of the Marital Home

Mr. Brewer contends that the trial court erred when it considered the proceeds from the sale of the marital home in

making a monetary award. He argues: (1) "The trial court erred by including the former marital home in its determination of available marital property from which to make a monetary award because the court had already ordered and approved the sale of the former marital home to [Mrs. Brewer] and an equal division of the proceeds to the parties"; (2) "[t]he trial court erred by including the former marital home in its determination of available marital property from which to make a monetary award, because the former marital home was no longer marital property at the time the court entered its judgment"; (3) "[t]he trial court's inclusion of the former marital home in its determination of available marital property constitutes double-counting"; (4) "[t]he trial court erred in making a monetary award of $175,000, because the monetary award exceeds the value of the marital property in [Mr. Brewer's] name"; and (5) "[t]he trial court erred in making a monetary award of $175,000 because the monetary award exceeds the amount necessary to adjust any inequities caused by the title of the marital property." These claims can be reduced to one issue: whether, after the trial court ordered the parties to evenly divide the proceeds from the sale of the marital home, the court could then award a monetary award that was based, in part, on the value of that asset.

"[I]t is elemental that a court cannot make an award whose amount exceeds the total value of the marital property." *E.g.*, *Ward*, 52 Md.App. at 343, 449 A.2d 443. " 'And of necessity, if the spouse to whom the court intends to grant a monetary award already owns (and thus will retain) any marital property, the award cannot exceed the value of the marital property owned by the other spouse.' " *Jandorf v. Jandorf*, 100 Md. App. 429, 441, 641 A.2d 971 (1994) (quoting *Odunukwe v. Odunukwe*, 98 Md.App. 273, 282, 633 A.2d 418 (1993)). Mr. Brewer contends that the trial court did just that: after excluding his half of the proceeds from the sale of the marital home, he was left with only $70,022.00 [9] in marital property

9. This figure includes Mr. Brewer's marital property that the trial court erroneously excluded in its amended judgment, namely, the marital

that was titled in his name, which is substantially less than the $175,000 awarded by the trial court. Mr. Brewer's assertion, however, assumes the value of the parties' proceeds from the sale of the house could not be considered in granting a monetary award. That assumption is incorrect.

 "[A] monetary award is ... an addition to and not a substitution for a legal division of the property accumulated during the marriage, according to title." *Ward,* 52 Md.App. at 339, 449 A.2d 443. "The clear intent of [the monetary award] is to counterbalance any unfairness that may result from the actual distribution of property acquired during the marriage, strictly in accordance with its title." *Id.* Furthermore, dividing jointly titled marital property does not preclude the court from considering the value of those proceeds in making a monetary award. *See id.* at 340, 449 A.2d 443 ("[W]hat triggers operation of the [monetary award] statute is the claim that a *division* of the parties' property according to title would create an inequity which could be overcome through a monetary award."). The proceeds from the sale of a jointly titled marital home are no exception. *See Coutant v. Coutant,* 86 Md.App. 581, 589, 587 A.2d 1125 (1991).

In *Coutant,* the trial court, in the judgment of divorce, awarded the wife custody of the parties' minor child and use and possession of the family home. *Id.* at 585, 587 A.2d 1125. At that time, the court did not make a monetary award because the parties' marital home was their only marital asset. *Id.* at 589, 587 A.2d 1125. Two and one half years later, the trial court transferred custody of the parties' minor child to the husband. *Id.* at 584, 587 A.2d 1125. For that reason, the trial court ruled that the wife was no longer entitled to the use and possession of the home. *Id.* It therefore ordered the sale in lieu of partition of the home and directed that the proceeds of the sale be placed in escrow pending a hearing. *Id.* At that hearing, the trial court declined to take additional

portion of the Vanguard Prime Money Market account and the savings bond.

evidence pertaining to a monetary award. In reversing that ruling, this Court held that the trial court erred "in refusing to consider the proceeds of the sale of the former marital home as marital property on the basis of which a monetary award could be granted." *Id.* at 589, 587 A.2d 1125.

■ Here, the parties each owned an undivided one-half interest in the marital home as tenants in common. Therefore, by ordering a sale in lieu of partition and dividing the proceeds equally, the court was merely making a division of the marital home according to title. Moreover, the Court would have been unable to order the proceeds to be divided in any other manner, because, with limited exceptions,[10] the court "may not transfer the ownership of personal or real property from 1 party to the other." FL § 8–202(a)(3). To hold that the proceeds from the sale of the home, which was nothing more than a division of the marital property according to title, could not then be considered in awarding a monetary award would be entirely inconsistent with the purpose of the monetary award—"to counterbalance any unfairness that may result from the actual distribution of property acquired during the marriage, strictly in accordance with its title." *Ward,* 52 Md.App. at 339, 449 A.2d 443. Mr. Brewer owned, in addition to the $70,022 in marital property that he claims, $192,025 in marital funds from the sale of the home. Therefore, the court's $175,000 monetary award did not, as he contends, exceed the value of Mr. Brewer's marital property. Nor, as Mr. Brewer claims, did the trial court "double-count" his assets.

## C. The Parties' Net Worth

■ Mr. Brewer further contends that the trial court erred in considering Mr. Brewer's non-marital assets because "[a] disparity in net worth is not a basis for making a

---

**10.** FL § 8–205(a) allows the court to "transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from 1 party to either or both parties...."

monetary award, which is used only to balance inequities in marital property . . . ." We disagree.

FL § 8–205(b)(2) states that the court shall consider "the value of all property interests of each party" in determining the amount and method of payment of a monetary award. And FL § 8–205(b)(3) repeats that instruction, by broadly directing the court to consider "the economic circumstances of each party at the time the award is to be made . . . ." Those provisions, we have held, require consideration of the parties' non-marital property in determining whether to grant a marital award and in what amount. In *Melrod v. Melrod,* 83 Md.App. 180, 197–98, 574 A.2d 1 (1990), we declared:

> [C]onsideration of two of those factors, the value of all property interests of each party and the economic circumstances of each party at the time the award is to be made, obviously requires the court to be aware of any non-marital property and have some idea of its worth. We do not believe that the statute requires the court to evaluate non-marital property in the same manner as marital property. It is enough if the court is generally aware of the relative wealth of the parties, in order that it can determine whether it would be equitable to award a greater share of marital property to the spouse owning less of the total property and having less wealth because of that spouse's greater need and the wealthy spouse's lesser need for additional assets.

Here, the trial court did more than FL § 8–205 required it to do: it carefully valued Mr. Brewer's substantial non-marital assets and then awarded Mrs. Brewer a greater share of the marital property based, at least in part, on what the court believed was the large disparity in the parties' wealth.

### D. The Joint Vanguard Money Market Account

Mr. Brewer argues that "the trial court erred by including non-extant proceeds from a joint Vanguard Money Market account in its determination of marital property." We agree.

In determining which property was marital, the trial court included $8,632 that was in a Vanguard Money Market ac-

count. That account, Mr. Brewer testified, did not exist at the time of the trial. Nor was there any evidence that these funds had been dissipated. Accordingly, the trial court erred in including the $8,632 in the pool of marital assets.

### E. Jewelry, Savings Bonds, And Vanguard Money Market Account

Mr. Brewer contends that the trial court "failed to include certain items of marital property," namely: (1) Mrs. Brewer's jewelry, (2) Mr. Brewer's savings bond, and (3) the marital portion of Mr. Brewer's Vanguard Prime Money Market account.

At trial, the parties agreed, and the court found, that these items were marital property. But the court did not include any of these items in its final judgment. Nor did it find that these items were non-marital assets. The net effect of these errors, however, including the inclusion of non-existing $8,632 Vanguard account, was to understate Mr. Brewer's marital property by $56,618 and Mrs. Brewer's marital property by $3,000. Because Mr. Brewer contends that the trial court's award was too high relative to the value of marital property titled in his name, he was not harmed by this error and cannot challenge it on appeal, as ordinarily, "only the party aggrieved by a judgment can appeal it." *Goldberg v. Goldberg,* 96 Md.App. 771, 784, 626 A.2d 1062 (1993). However, because we are remanding this case, the trial court will have the opportunity to correct this error.

### F. The Office Furniture

Mr. Brewer contends that the trial court "improperly ordered the sale and division of proceeds of [office furniture that was] titled solely in each party's individual name." We agree.

According to the parties' Joint Marital Property Statement, the parties agree that they each had office furniture that was owned individually. The trial court did not hold otherwise. Nonetheless, it ordered that the furniture be sold and the

proceeds to be divided equally. In so doing, the trial court erred.

As this Court observed in *Pleasant v. Pleasant*, 97 Md.App. 711, 632 A.2d 202 (1993):

> In Maryland, in a domestic case, the trial judge has no authority to transfer ownership of property from one of the parties to the other, other than to transfer an interest in a pension, retirement, profit sharing, or deferred compensation plan. Rather, the trial judge may either grant a monetary award to adjust the equities of the parties, or, in the case of property owned by both of them, order that the property be sold and the proceeds divided equally.

*Id.* at 720, 632 A.2d 202 (citations omitted); *see also Fox*, 85 Md.App. at 453 n. 2, 584 A.2d 128 ("Absent consent of the parties, ordering the sale of property owned solely by the husband ... instead of increasing the monetary award *pro tanto* was improper."). Here, the office furniture was owned by the parties individually, not jointly. The court therefore had no authority to order the sale of the property and the division of the proceeds.

### G. Mr. Brewer's Non–Marital Contribution to the Marital Home

The trial court found that Mr. Brewer contributed $10,800 from his inherited non-marital funds to pay off a mortgage on the marital home. The parties owned the home as tenants in common. Observing that Mr. Brewer was "obviously entitled to that money back upon the sale of the marital home," it ordered the parties to divide the proceeds from the sale of the home, after reimbursing Mr. Brewer from that amount.

However well-intentioned, this order was improper. FL § 8–202(a)(3) states that "the court may not transfer the ownership of personal or real property from 1 party to the other." *Pleasant*, 97 Md.App. at 720, 632 A.2d 202; *Fox*, 85 Md.App. at 453 n. 2, 584 A.2d 128. Thus, upon the sale of the parties' home, the trial court could not adjust the parties'

rights to the proceeds, as they each owned an undivided one-half interest in the property, as tenants in common. Notwithstanding this error, it appears from the trustee's report that, despite the court's order, the parties evenly divided the proceeds without first deducting Mr. Brewer's mortgage payment.

We do not mean to suggest by this analysis that there are no means by which the court could have credited Mr. Brewer with that payment. Instead of deducting the payment from the proceeds of the sale of the house, the court could have quite properly made an adjustment to the marital award to reflect this payment.

### H. Mrs. Brewer's Conduct During the Litigation

Mr. Brewer contends that the trial court erred in "fail[ing] to consider [Mrs. Brewer's] conduct at the time of the separation and during the pendency of the case" when it granted her a monetary award.

In support of that curious proposition, Mr. Brewer cites FL § 8–205(b), pointing out that, in addition to the ten specific factors set forth in that section of the Code for determining whether a monetary award is appropriate, § (b)(11) requires the court to also weigh "any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in the pension, retirement, profit sharing, or deferred compensation plan, or both." By failing to consider Mrs. Brewer's improper conduct during the parties' separation and the pendency of this matter, the trial court, Mr. Brewer maintains, erroneously disregarded that requirement. The conduct to which Mr. Brewer is referring was Mrs. Brewer's unauthorized entry into the marital home after she left, the withdrawals she made from certain accounts, and her hiring of a private detective to copy the contents of Mr. Brewer's email messages and files from his computer.

Contrary to Mr. Brewer's claim, however, the trial court did consider the conduct of the parties but not in the context of

Mr. Brewer's choosing. In determining whether to award counsel fees, the trial judge reviewed the behavior of the parties and concluded that "this case could have been much more litigious than it was, and I don't find that there was any dilatory tactics or any—no one was out of bounds in this case in terms of the way it was litigated...." Neither in that conclusion nor in the failure of the trial court to address this subject in other contexts do we find error.

## III

Mr. Brewer contends that the trial court erred because it "failed to decree [his] ownership interest in the furniture that he inherited form his parents and failed to order [Mrs. Brewer] to return that property to [him]." We agree.

In its oral ruling, the trial court ruled:

There was no evidence, indeed, no testimony, that [the inherited furniture] was intended to be a gift to the marriage. The Court finds that that furniture is non-marital furniture, non-marital property, and that the furniture that belonged to the parents of Mr. Brewer and was inherited by Mr. Brewer is non-marital property, and he is to retain that.

That ruling, however, was not included in the original judgment, nor was it included in the amended judgment. This oversight should be corrected on remand.

## IV

Mr. Brewer contends that "[t]he trial court's finding that [he] gave [Mrs. Brewer] the jewelry that he inherited from his mother is clearly erroneous."

To create an *inter vivos* gift,

[f]oremost, the donor must intend to transfer the property. In order to prove donative intent, it must be shown from the evidence that the donor clearly and unmistakably intended to permanently relinquish all interest in, and control over the gift. In addition, there must be a delivery transferring the donor's dominion over the property without power of

revocation or retention of dominion over the subject of the gift. Acceptance by the donee is the final requirement of a valid gift and it is presumed, barring evidence to the contrary.

*Dorsey v. Dorsey,* 302 Md. 312, 318, 487 A.2d 1181 (1985) (citations omitted). Furthermore, "the burden is on the donee to establish every element of a gift," which must be proven by clear and convincing evidence. *Id.*

The parties gave conflicting testimony as to the jewelry. Mr. Brewer claimed he never gave the inherited jewelry to Mrs. Brewer. But Mrs. Brewer testified that after Mr. Brewer's mother died, "[Mr. Brewer] handed the jewelry to me, and he said, '[h]ere. I want you to have the jewelry. Feel free to use it. Wear it. Enjoy it.'" She further claimed that her mother-in-law was "like a second mother" to her and that the two were "very close."

After considering this testimony, the trial court found Mrs. Brewer's testimony to be more credible than Mr. Brewer's and concluded that "Mr. Brewer's mother would have wanted Mrs. Brewer to have that jewelry, and [Mr. Brewer] gave it to her, and he cannot now at the time of the divorce take it back and claim that it is non-marital." As "the credibility of the witnesses [is] a matter for the trial court, as fact finder, not the appellate court, to resolve," *State v. Smith,* 374 Md. 527, 535, 823 A.2d 664 (2003) (quoting *State v. Raines,* 326 Md. 582, 590–93, 606 A.2d 265 (1992)), we shall not disturb that finding.

## Cross–Appeal

### V

Mrs. Brewer, in turn, contends that the trial court erred because it "failed to make an award of counsel fees to [Mrs. Brewer], despite her need for such an award." Although we disagree, we shall vacate the trial court's denial of counsel fees so that it may reconsider that denial in light of any changes it may wish to make to the alimony or monetary award on remand. *Doser,* 106 Md.App. at 335–36 n. 1, 664 A.2d 453; *Reuter,* 102 Md.App. at 245, 649 A.2d 24. We shall nonethe-

less address the merits of this claim for the guidance of the trial court on remand.

■ We begin by noting that " '[t]he award or denial of counsel fees is governed by the abuse of discretion standard.' " *Caccamise v. Caccamise*, 130 Md.App. 505, 519, 747 A.2d 221 (2000) (quoting *Doser*, 106 Md.App. at 359, 664 A.2d 453). FL § 11–110(b) states: "At any point in a proceeding under this title, the court may order either party to pay to the other party an amount for the reasonable and necessary expense of prosecuting or defending the proceeding." Before ordering such a payment, the court shall consider: "(1) the financial resources and financial needs of both parties; and (2) whether there was substantial justification for prosecuting or defending the proceeding." FL § 110(c); *Harbom v. Harbom*, 134 Md.App. 430, 463–64, 760 A.2d 272 (2000).

The trial court indicated at the hearing on the motion to alter or amend the judgment that in deciding the issue of counsel fees it would consider "the ability to pay, the needs and so forth." The trial court also noted: "[T]his case could have been much more litigious that it was, and I don't find that there was any dilatory tactics or any—no one was out of bounds in this case in terms of the way it was litigated...." It then ordered the parties to pay their own counsel fees. There is no evidence that, in doing so, it abused its discretion. In fact, from the words that it selected in making that ruling, it is clear that it properly considered the factors set forth in FL § 11–110(c) for making such an award.

## VI

Mrs. Brewer contends the trial court erred by "reduc[ing] the monetary award by $75,000 and the alimony by $500 per month without any reason being given." Because we are vacating the alimony and monetary awards on other grounds, we need not reach the merits of this claim.

## VII

■ Mrs. Brewer contends "[t]he court below was clearly erroneous in finding that there was no gift of the [inherited]

furniture used in the family home to [Mrs. Brewer]." We disagree.

Mr. Brewer inherited numerous pieces of furniture from his parents, which the parties used to replace their old furniture in the marital home. Indeed, Mrs. Brewer testified that the new inherited furniture replaced "literally everything in the house . . . [the] [b]eds we slept on, living room furniture, dining room furniture, family room [furniture], [and the] kitchen [furniture]." She therefore claimed that Mr. Brewer made a gift of the furniture to the marriage. The trial court disagreed and found that, unlike the jewelry, there was no evidence that Mr. Brewer intended the furniture "to be a gift to the marriage." Hence, the inherited furniture was non-marital and belonged to Mr. Brewer.

In Maryland, furniture used for marital purposes is presumed to be jointly owned, regardless of whether one spouse used separate funds to purchase that furniture. *Bender v. Bender,* 282 Md. 525, 534, 386 A.2d 772 (1978). In *Bender,* the Court of Appeals held:

> [I]n the case of household goods and furnishings acquired for the use of the family in contemplation of or after marriage, the mere fact that the funds used for the purchase belonged to one or the other of spouses does not result in the furnishing in question being owned solely by that spouse. It is to be presumed in such a case that the purchasing spouse made a gift of the property to the marital unit, creating ownership by the entireties in the husband and wife, absent proof demonstrating sole ownership in one of the marital partners.

*Id.*

Mrs. Brewer argues that this presumption should also apply to cases in which one of the spouses inherits, rather than purchases, household goods or furniture that are subsequently used in the marital home.

Although there are no Maryland cases precisely on point, the Court of Appeals of South Carolina addressed this issue in *Pappas v. Pappas,* 300 S.C. 62, 386 S.E.2d 301 (S.C.Ct.App.

1989). In *Pappas,* the wife's family gave her a silver set as a gift in honor of her engagement to her husband. *Id.* at 302. When the parties separated, the husband claimed that it was marital property. *Id.* He argued that, although the silver set was non-marital property at the time that it was acquired by his wife, Mrs. Pappas had transmuted what was originally non-marital property into marital property by "us[ing] the silver for family purposes during the marriage." *Id.* at 304. The South Carolina appellate court disagreed, stating:

> [The wife] did testify that she used the silver for family purposes on special occasions and holidays. This alone does not prove that she intended the silver to become marital property. By its very nature, a silver service is something that will be used by the whole family, not one person. Using it in the normal fashion is not in itself evidence of an intent to make it marital property.

*Id.* at 66, 386 S.E.2d 301.

Although that case dealt with the question of whether the property was marital—whereas here we are faced with the question of whether this property is jointly owned—we nonetheless find *Pappas* to be instructive. Simply using inherited household goods as they are intended to be used is not enough to create a presumption that the spouse intended to make a gift of the property to the marital unit. A distinction can legitimately be drawn between a spouse purchasing household goods or furnishings for family use and inheriting those same goods. Unlike purchased goods, inherited items frequently have a sentimental value that exceeds market worth, but only to the recipient.

What is more, Mrs. Brewer's argument would require a spouse, who inherits furnishings, to keep them in pointless storage or forbid other family members from making any use of them to avoid a judicial determination that they are jointly owned. While a joint property presumption may be appropriate in cases in which one of the spouses, by choice, goes out and purchases furnishings for family use, we are not persuaded that it is appropriate in instances in which one spouse

passively inherits that property. We decline to extend this presumption to inherited household goods and furnishings. Hence, the trial court was not clearly erroneous in finding that, unlike the jewelry, there was no evidence that Mr. Brewer intended the furniture to be a gift to the marriage.

## VIII

Mrs. Brewer contends that "[t]he trial court erred when it failed to impute a higher rate of return to [Mr. Brewer's] investment assets." We disagree.

In awarding alimony, the court may impute income to a party if that party is capable of earning more income than he or she is earning at the time of the divorce. *See Turner v. Turner,* 147 Md.App. 350, 385, 809 A.2d 18 (2002); *Crabill v. Crabill,* 119 Md.App. 249, 262, 704 A.2d 532 (1998); *Colburn v. Colburn,* 15 Md.App. 503, 515–16, 292 A.2d 121 (1972). In *Crabill,* the trial court imputed income to the fifty-three year old husband who had retired from his career with the District of Columbia Fire Department. 119 Md.App. at 254–55, 704 A.2d 532. After finding that the husband was an experienced painter and could work part time in that capacity, the trial court concluded that, retired or not, he was "capable of working, and should work at this time to contribute to the family needs." *Id.* at 255, 704 A.2d 532. The trial court therefore imputed an additional $1,458.33 per month to his income. *Id.*

Affirming that decision, we stated: "The trial court acted within its discretion in considering [the husband's] painting income as part of *all* income for alimony purposes." *Id.* at 262, 704 A.2d 532. Similarly, in *Turner,* this Court upheld the trial court's decision to impute a $35,000 annual income to the wife, who was "clearly employable, given her age, health, work experience, skills, and absence of minor children in the home," but "had 'no intention to seek employment. . . .' " 147 Md. App. at 384–85, 809 A.2d 18.

Here, Mrs. Brewer argues that the trial court erroneously failed to impute to Mr. Brewer the additional income he would

receive if he changed his investment strategy from growth stocks to income-producing securities. Unable to cite any Maryland cases in support of this proposition, she relies on a New Jersey case, *Miller v. Miller*, 160 N.J. 408, 734 A.2d 752 (N.J.1999). In *Miller*, after declaring that "there is no functional difference between imputing income to the supporting spouse earned from employment versus that earned from investment," the Supreme Court of New Jersey held that the trial court had erred by not imputing additional investment income to the husband, an experienced investor, because he "could invest his substantial capital assets to yield more than the approximately 1.6% interest he [was] ... earning on his growth stock investments." *Id.* at 760. The New Jersey court observed that investing in income investments "would not require that [the husband] deplete his considerable principal; it only means that [he] could invest his principal differently in higher yield investment options available to him, much in the same way that an underemployed spouse could obtain a higher paying job available to him to make a more productive use of his human capital." *Id.* It then instructed the trial court "to impute a rate of return based on long-term corporate bonds[,] [specifically,] ... Moody's Composite Index on A-rated Corporate Bonds." *Id.* at 761, 734 A.2d 752. But such a result is not required by Maryland Law.

In fact, in *Barton v. Hirshberg*, 137 Md.App. 1, 20, 767 A.2d 874 (2001), a child support case, this Court expressly rejected that argument. In *Barton*, the mother argued that the trial court had erred in failing to consider the father's non-income producing assets in determining an above-the-guidelines child support award. *Id.* at 19, 767 A.2d 874. We disagreed but did state that such assets could be considered if "a parent voluntarily decreases his or her income to avoid support payments," or "where the income of a parent is not adequate to provide support to a child sufficient to meet the standard of living established during the marriage." *Id.* at 20, 767 A.2d 874. Rejecting the notion that "non-income-producing assets alone constitute a basis for reliance upon those assets in determining child support," we opined:

[T]he decision to devote assets to capital growth, rather than income production, should be within the discretion of a parent, as long as the children are provided reasonable support, consistent with that provided during the marriage or other relationship. It would be an unwise proposition, indeed, for a court to direct that a parent expend or convert his or her investments to provide support for children at a level above the guidelines, when the parent had consistently, during the marriage or other relationship, sought to utilize those assets for capital growth or other legitimate purposes which were not income-producing.

Here, as in *Barton,* Mr. Brewer has always invested his assets in growth investments. He testified that the various investment publications he had consulted indicated that "growth over the long term tends to do much better than income [investments]." Nor did Mrs. Brewer contend that he chose this strategy simply to lessen his alimony payments. Under the circumstances, the trial court neither erred nor abused its discretion by not imputing a higher rate of return to Mr. Brewer from his investment assets.

**JUDGMENT WITH REGARD TO ALIMONY, MONETARY AWARD, AND COUNSEL FEES VACATED; AND CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**